Jeffrey L. SILVERMAN, Petitioner,

v.

**COMMODITY FUTURES TRADING COMMISSION, Respondent.**

No. 76–1469.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 21, 1977.

Decided Feb. 16, 1977.

Howard Schneider and Joan Loizeaux, Commodity Futures Trading Commission, Washington, D. C., for respondent.

Before CUMMINGS, PELL and SPRECHER, Circuit Judges.

SPRECHER, Circuit Judge.

This appeal tests the validity of a suspension of trading privileges on commodity futures markets imposed upon an account executive in the commodity brokerage business.

## I

The Commodity Futures Trading Commission (CFTC or Commission) is an independent federal regulatory agency which began operating on April 21, 1975, pursuant to the Commodity Futures Trading Commission Act of 1974 (CFTC Act or Act), Pub.L.No.93–463, 88 Stat. 1389, *et seq.*, which amended the Commodity Exchange Act, 7 U.S.C. §§ 1–17a.

The CFTC's principal responsibility relates to contracts of sale of commodities for future delivery traded or executed on boards of trade, that is, commodity exchanges which have been designated by the Commission as "contract markets" for specific commodity futures contracts. 7 U.S.C. § 7. It is unlawful to affect a commodity futures transaction · other than by or through a member of a "contract market." 7 U.S.C. § 6.

All futures commission merchants (7 U.S.C. § 6d), floor brokers (§ 6e), persons associated with futures commission merchants (§ 6k), commodity trading advisors and commodity pool operators (§ 6m) must register with the CFTC.

The Commission is entrusted with enforcing the regulatory requirements and proscriptions of the Act against registrants and other persons subject to the Act. One of the statutory provisions which the Commission enforces is section 4b, 7 U.S.C. § 6b, which makes it "unlawful . . . for any member of a contract market . . . or employee of any member . . . in or

Joel J. Bellows, Charles B. Bernstein, Chicago, Ill., for petitioner.

in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, made, or to be made, on or subject to the rules of any contract market, for or on behalf of any other person . . . to cheat or defraud or attempt to cheat or defraud such other person." [1]

On March 13, 1973, a complaint was brought before the Secretary of Agriculture, alleging violations by the petitioner, Jeffrey L. Silverman, of section 4b of the CFTC Act. On May 5, 1976, a final order was entered by the CFTC, prohibiting the petitioner from trading on or subject to the rules of any contract market for a period of two years. The petitioner was also ordered to permanently cease and desist from placing, or causing to be placed, in any customer's account, any contracts of sale of any commodity for future delivery, without the prior knowledge, consent or authorization of such customer.

The petitioner filed his petition for review of the final order pursuant to 7 U.S.C. § 9, contending that (1) the evidence does not support the finding of willful violation of section 4b of the Act; (2) the petitioner was denied due process by the arbitrary conduct of the CFTC; and (3) the CFTC violated its operational guidelines.

## II

In *Great Western Food Distributors, Inc. v. Brannan*, 201 F.2d 476, 479–80 (7th Cir. 1953), this court delineated the scope of appellate review in a case of the suspension of commodity trading privileges under the Commodity Exchange Act:

> Often the "most telling part" of the evidence is not apparent from the printed page, "for on the issue of veracity the bearing and delivery of a witness will usually be the dominating factors". *N.L.R.B. v. Universal Camera Corp.*, 2 Cir., 190 F.2d 429, 430. Thus, "we may not disregard the superior advantages of the examiner who heard and saw the witnesses for determining their credibility, and so for ascertaining the truth." *Ohio Associated Tel. Co. v. N.L.R.B.*, 6 Cir., 192 F.2d 664, 668.

\* \* \* \* \* \*

It would seem, then, that the function of this court is something other than that of mechanically reweighing the evidence to ascertain in which direction it preponderates; it is rather to review the record with the purpose of determining whether the finder of the fact was justified, i. e. acted reasonably, in concluding that the evidence, including the demeanor of the

---

1. 7 U.S.C. § 6b provides in fuller part:

It shall be unlawful (1) for any member of a contract market, or for any correspondent, agent, or employee of any member, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce, made, or to be made, on or subject to the rules of any contract market, for or on behalf of any other person, or (2) for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, made, or to be made, on or subject to the rules of any contract market, for or on behalf of any other person if such contract for future delivery is or may be used for (a) hedging any transaction in interstate commerce in such commodity or the products or by-products thereof, or (b) determining the price basis of any transaction in interstate commerce in such commodity, or (c) delivering any such commodity sold, shipped, or received in interstate commerce for the fulfillment thereof—

(A) to cheat or defraud or attempt to cheat or defraud such other person;

(B) willfully to make or cause to be made to such other person any false report or statement thereof, or willfully to enter or cause to be entered for such person any false record thereof;

(C) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order or contract or the disposition or execution of any such order or contract, or in regard to any act of agency performed with respect to such order or contract for such person; or

(D) to bucket such order, or to fill such order by offset against the order or orders of any other person, or willfully and knowingly and without the prior consent of such person to become the buyer in respect to any selling order of such person, or become the seller in respect to any buying order of such person.

witnesses, the reasonable inferences drawn therefrom and other pertinent circumstances, supported his findings. To go further is to disregard the "most telling part" of the evidence.

The petitioner contended that the Commission failed to give him notice of the alleged misconduct and an opportunity to achieve compliance in accordance with section 9(b) of the Administrative Procedure Act, which provides in pertinent part, 5 U.S.C. § 558(c):

Except in cases of willfulness . . , the withdrawal, suspension, revocation, or annulment of a license is lawful only if, before the institution of agency proceedings therefor, the licensee has been given—

(1) notice by the agency in writing of the facts or conduct which may warrant the action; and

(2) opportunity to demonstrate or achieve compliance with all lawful requirements. (Emphasis added.)

The same argument was made by a commodities dealer in Goodman v. Benson, 286 F.2d 896, 900 (7th Cir. 1961), where we held that section 9(b) was inapplicable by its terms to willful cases and said:

We think it clear that if a person 1) intentionally does an act which is prohibited,—irrespective of evil motive or reliance on erroneous advice, or 2) acts with careless disregard of statutory requirements, the violation is wilful.

The Administrative Law Judge made several findings and conclusions relating to petitioner's willfulness:

There is no room to consider that the trades made were the product of innocent mutual or unilateral mistake or misunderstanding. They were clearly the results of a pattern and program of trading in large measure carried on over a period of years with many people in an inten-

tional and calculated manner by [Silverman]. ALJ's Decision, p. 25; emphasis added.

The record suggests that unauthorized trading, as here, is common enough for [Silverman] to feel comfortable in it, and to attempt to justify it by volatile market conditions creating or destroying opportunities for profitable trades too swiftly to contact a client. ALJ's Decision, pp. 20–21.

By reason of the facts and conclusions as set forth, [Silverman] has wilfully violated section 4b of the Commodity Exchange Act . . . as charged. ALJ's Decision, p. 26.

The findings and conclusions indicated that the petitioner's conduct was willful under either part of the definition set out in Goodman v. Benson, supra. Furthermore, the ALJ's findings and conclusions regarding the petitioner's willfulness are fully supported by the record.

The CFTC Act was designed to insure "fair practice and honest dealing on the commodity exchanges."[2] Hearings were held before the Administrative Law Judge on six days in February and March, 1974, consuming 1211 pages of transcript. The record revealed that the petitioner was employed from July 1969 to October 1970, as an account executive with the commodity brokerage firm of Woodstock, Inc. and from October 1970 to March 13, 1972 with the firm of Conti-Commodity Services. The petitioner was charged with entering into 23 unauthorized transactions with three Woodstock customers (Borgers, Tuczai and Stengel) and with two Conti customers (Barbiere and McGuire).

Borgers went on an extended vacation in the summer of 1970 and gave the petitioner authority to make trades on his account in live cattle, live hogs and pork bellies. Although the petitioner had no authority to

2. S.Rep.No.93–1131, 93d Cong., 2d Sess. (Aug. 29, 1974), U.S.Code Cong. & Adm.News, 93d Cong., 2d Sess. at 5844 (1974): "The bill is designed to further the fundamental purpose of the Commodity Exchange Act in insuring fair practice and honest dealing on the commodity exchanges and providing a measure of control over those forms of speculative activity which often demoralize the markets to the injury of producers, consumers, and the exchanges themselves."

make egg transactions on Borgers' behalf, the petitioner made an egg trade on August 18, 1970, to which Borgers objected. Thereafter, despite Borgers' express direction that no egg trades be made, the petitioner proceeded to make eight unauthorized egg transactions on Borgers' account.

Tuczai instructed the petitioner in March 1970 not to make any trades without his specific permission. Nevertheless in October 1970, the petitioner made six unauthorized egg transactions on Tuczai's account.

Stengel had previously experienced some difficulties relating to unauthorized trading by a Woodstock solicitor and therefore instructed the petitioner that no trades were to be made without his express prior consent. Despite that fact the petitioner made four unauthorized egg trades and one unauthorized hog trade on Stengel's behalf.

█ The petitioner testified that he had oral authority from Borgers, Tuczai and Stengel in regard to the 18 egg transactions and that the Stengel hog transaction was consummated as an offset because one of Stengel's checks had bounced in connection with an authorized hog transaction. The ALJ did not credit the petitioner's testimony but did credit the countervailing testimony. We cannot substitute our views of credibility for that of the ALJ, assuming that we were so inclined.

Barbiere, one of the Conti customers, testified that he did not believe that he authorized two pork belly contracts and one London sugar contract on March 9, 1972 "but . . . [the petitioner] could have misinterpreted [a conversation] as an authorization." These transactions were not found

by the ALJ to be violations by the petitioner. However, a few days later, a March 13, 1972 hog belly transaction was completely unauthorized by Barbiere and was found to be a violation.

The petitioner contended that all of Barbiere's transactions were authorized because he had signed a "Trading Authorization Limited to Purchases and Sales of Commodities." Barbiere testified that he understood the document which he had signed to be a mere authorization for the petitioner to make trades for him after specific authorization had been given to make specific trades.[3] He further testified that he had refused to sign a general power of attorney.[4]

The ALJ made the following findings and conclusions in this regard (ALJ's Decision, p. 17):

> The flat refusal by Barbiere to sign a power of attorney is clear indication of his state of mind, and is persuasive that he intended to retain full control over his account. The signature on the "Trading Authorization" form was obtained without informed consent by Barbiere. Further, the account did not meet the CME rules for controlled or managed accounts in regard to financial or other requirements.

In *Geldermann & Co., Inc. v. Lane Processing, Inc.*, 527 F.2d 571, 575–76 (8th Cir. 1975), the court, after giving consideration to the fact that "when a party of little bargaining power, and hence little real choice, signs a commercially unreasonable contract with little or no knowledge of its

---

**3.** Barbiere testified: "I understood that document . . . [that] he would be acting as my agent to make purchases." (Tr. 299).

      \*    \*    \*    \*    \*    \*

"[M]y interpretation, an agent who would be able to make these purchases for me. The only understanding I would be notified prior to making any of these transactions. That was my understanding of what that document meant . . . ." (Tr. 300).

**4.** Barbiere testified: "When the discussion of power of attorney was brought to my attention I flatly refused. I felt this wasn't the situation I wanted to be involved with."

      \*    \*    \*    \*    \*    \*

"[Silverman] asked me at that time when I opened the account whether or not, you know, how I felt about it. I was very strongly against [a power of attorney]. I believe very firmly that . . . I should have the privilege of making my own mistakes and pay for them. This is the reason I didn't elect to give the power of attorney. . . . I felt for the type of thing I participated in there would be no use for that speed." (Tr. 270).

terms it is hardly likely that his consent, or even an objective manifestation of his consent, was ever given to all the terms," held that the terms of a commodities signature card gave a commodities broker the authority to make certain transactions where the customer had a net worth of $7,000,000 and "was a sophisticated investor and entrepreneur." Here the petitioner conceded that "Barbiere was a novice in commodity trading." Pet. Reply Br. 7.

The other Conti customer, McGuire, testified that the petitioner had made three unauthorized pork belly transactions in March 1972, on his account. The petitioner again testified that he had been given verbal authorization and also that McGuire had sent in a written "Trading Authorization." However, whereas the petitioner had produced Barbiere's written authorization, he did not produce any written authorization from McGuire. The petitioner's arguments relating to oral authorization by both Barbiere and McGuire merely amount to attacks on the ALJ's credibility determinations, which we cannot overturn.

■ In summary, we find that the evidence amply supports the ALJ's finding that the petitioner willfully violated section 4b of the CFTC Act.

### III

The petitioner has argued that he was denied due process during the administrative proceedings in several ways, many of which relate to the prehearing production of documents by the CFTC.

■ There is no basic constitutional right to pretrial discovery in administrative proceedings. *Starr v. Commissioner of Internal Revenue*, 226 F.2d 721, 722 (7th Cir. 1955), *cert. denied*, 350 U.S. 993, 76 S.Ct. 542, 100 L.Ed. 859.(1955); *N.L.R.B. v. Interboro Contractors, Inc.*, 432 F.2d 854, 857 (2d Cir. 1970). The Administrative Procedure Act contains no provision for pretrial discovery in the administrative process (1 Davis, Administrative Law Treatise (1958) § 8.15, p. 588) and the Federal Rules of Civil Procedure for discovery do not apply to

administrative proceedings (*N.L.R.B. v. Vapor Blast Mfg. Co.*, 287 F.2d 402, 407 (7th Cir. 1961)). The regulations of the Commodity Exchange Authority of the Department of Agriculture did not provide, at the time of the administrative hearing, for prehearing discovery.

Nevertheless the due process clause does insure the fundamental fairness of the administrative hearing. We have said:

True it is that administrative convenience or even necessity cannot override the constitutional requirements of due process. *Ohio Bell Telephone Co. v. Public Utilities Commission of Ohio*, 301 U.S. 292, 304, 57 S.Ct. 724, 81 L.Ed. 1093. However, in administrative hearings the hearing examiner has wide latitude as to all phases of the conduct of the hearing, including the manner in which the hearing will proceed. *Radio Corp. of America v. United States*, 341 U.S. 412, 420, 71 S.Ct. 806, 95 L.Ed. 1062; *Wallace v. N.L.R.B.*, supra, 323 U.S. 248 at page 253, 65 S.Ct. 238 at page 240, 89 L.Ed. 216; *N.L.R.B. v. Algoma Plywood & Veneer Co.*, 7 Cir., 121 F.2d 602, 604. Administrative agencies should be "free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." *Federal Communications Comm. v. Pottsville Broadcasting Co.*, 309 U.S. 134, 143, 60 S.Ct. 437, 441, 84 L.Ed. 656.

*Cella v. United States*, 208 F.2d 783, 789 (7th Cir. 1953); *see also, Swift & Co. v. United States*, 308 F.2d 849, 852 (7th Cir. 1962) (and at 851: "Due process in an administrative hearing, of course, includes a fair trial, conducted in accordance with fundamental principles of fair play and applicable procedural standards established by law.")

■ The petitioner was provided in advance of the hearing with copies of all proposed exhibits, a list of all proposed witnesses, the identity of the government employees who had investigated the case and copies of memoranda reflecting petitioner's own statements to administrative representatives.

**34**

The petitioner also sought under the Freedom of Information Act, 5 U.S.C. § 552, the agency's internal non-public guidelines relating to the conduct of investigations. The three such guidelines which were applicable to the investigation of the kind involved herein were furnished to the petitioner prior to the hearing. Upon the petitioner's filing of a proceeding in the federal district court for the Northern District of Illinois under the Freedom of Information Act, the agency voluntarily provided the petitioner with all of the remaining guidelines, but this occurred after the administrative hearing. The petitioner then moved to dismiss the complaint, merely stating that he "was unable to obtain and use for the purposes of that hearing, the requested information so as to prepare a line of defense or to properly cross-examine the investigators who participated in the preparation of the case." Prior to rendering his decision and order, the Administrative Law Judge denied the petitioner's motion to dismiss, stating in part:

> [Silverman] . . . fails to make any showing of the subject matter to be explored in the requested supplemental cross-examination opportunities, its relationship to the issues herein, the relevancy or materiality to said issues . . . and the relative merit or prejudice expected to be established by it. [Silverman] . . . fails to show that it would be anything other than merely cumulative, and that it involves anything other than speculation and hypothesis.

For all of these reasons, the denial of the petitioner's motion to dismiss, or in the alternative to reopen, the proceedings was not a denial of due process. Administrative proceedings would become a shambles if they could be reopened upon mere request and without a supportive showing of need.

The petitioner also sought copies of statements received from customers and reports the administrative investigators had prepared concerning their interviews with customers. Although the Jencks Act, 18 U.S.C. § 3500, applies by its terms only "in any criminal prosecution brought by the

United States," the agency here complied with the Act's requirements that statements of witnesses be produced after the witnesses have testified on direct examination, by furnishing the petitioner during the course of the hearing with witnesses' statements and reports of interviews with them.

The petitioner also complained that he was entitled (1) to "a statement of the procedure employed by . . . [the investigators] in interrogating the five customers," (2) to take depositions of the investigators, and (3) to show that the investigators deviated from the administrative guidelines. The denial of these requests did not constitute deprivation of due process in the light of the whole record. Obviously an administrative hearing cannot be diverted into a trial of the mechanics of the preliminary investigation unless some flagrant abuses are shown, and such a showing could be made upon cross-examination of the witnesses during the hearing. Nor is it necessary for an investigator to scrupulously adhere to each detail of a "guideline." Every investigation must necessarily differ from all others and guidelines are only that. Guidelines are intended to generally facilitate the business of the agency and not as conferring important procedural benefits upon the subjects of investigation. *American Farm Lines v. Black Ball Freight Service*, 397 U.S. 532, 538–39, 90 S.Ct. 1288, 25 L.Ed.2d 547 (1970); *United States v. Lockyer*, 448 F.2d 417, 420–21 (10th Cir. 1971).

The petitioner also invoked the doctrine of laches because (1) the violations occurred in 1970 and 1972 whereas the complaint was filed on March 13, 1973, and (2) the hearing file was submitted to the Administrative Law Judge on December 30, 1974 whereas his decision was filed on December 30, 1975. "It is well settled that the United States is not bound by state statutes of limitation or subject to the defense of laches in enforcing its rights." *United States v. Summerlin*, 310 U.S. 414, 416, 60 S.Ct. 1019, 1020, 84 L.Ed. 1283 (1940).

Finally, the petitioner has raised numerous other issues, all of which we have con-

sidered and deem to be without merit. In particular, we find the various rulings of the Administrative Law Judge before, during and after the hearing to be well within his sound discretion and not constituting any deprivation of due process.

For these reasons the order of the Commodity Futures Trading Commission should be affirmed.

AFFIRMED.