Robert F. HALTMIER, Petitioner,

v.

COMMODITY FUTURES TRADING COMMISSION, Respondent.

No. 533, Docket 76–4169.

United States Court of Appeals, Second Circuit.

Argued March 17, 1977.

Decided May 9, 1977.

Robert F. Haltmier, pro se.

Frederic T. Spindel, Associate Gen. Counsel, Commodity Futures Trading Commission, Washington, D. C. (Howard Schneider, Gen. Counsel, Richard E. Nathan, Deputy Gen. Counsel, and Jeffrey J. Milton, Atty., Commodity Futures Trading Commission, Washington, D. C., on the brief), for respondent.

Before LUMBARD and TIMBERS, Circuit Judges, and DAVIS, Judge, Court of Claims.*

DAVIS, Judge:

■ Robert Haltmier, acting *pro se,* petitions for review, under §§ 6(b) and 6(c) of the Commodity Exchange Act, as amended, 7 U.S.C. §§ 9 and 13b (Supp. IV, 1974), of an order of the Commodity Futures Trading Commission prohibiting him from trading in commodity futures for a period of eighteen months and directing him to cease and desist from unauthorized futures trans-

actions for the account of any customer and from cheating or defrauding anyone in connection with orders for commodity futures contracts.[1]

The proceedings began in 1974, before the Commission existed and when the Commodity Exchange Act was being wholly enforced by the Department of Agriculture, with an administrative complaint charging Haltmier, then an account executive with Conti-Commodity Services (a registered futures commission merchant under the Commodity Exchange Act), with having wilfully violated the Act's antifraud provisions by entering on behalf of a customer into a number of commodity futures transactions without the customer's authorization or knowledge. A hearing was held before an administrative law judge who concluded (in September 1975) that the allegations of the complaint had been sustained and that sanctions should be imposed against petitioner, including suspension for five years from all trading privileges on commodities markets. By that time the Commission (which began operations on April 21, 1975) had taken over (from the Secretary of Agriculture) enforcement functions under the Commodity Exchange Act,[2] and review of the administrative law judge's decision was had by the Commission. That body, with one dissent, upheld the finding of a statutory violation but reduced the suspension of trading privileges to an eighteen-month period.

---

* Hon. Oscar H. Davis, *Judge, U.S. Court of Claims,* sitting by designation.

1. Petitioner did not literally file a written petition with this court as required by the statute but in timely fashion wrote to the Commission that he intended to seek review of the agency's order and had already contacted this court and asked the agency to transmit the administrative record to the court. The Commission calls our attention to this departure from the formal statutory procedure but makes no point of it. Because petitioner appears *pro se* (see *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); *Stirling v. Chemical Bank,* 511 F.2d 1030, 1031–32 (2d Cir. 1975); *Alley v. Dodge Hotel,* 163 U.S.App.D.C. 320, 501 F.2d 880 (1974), we consider that his informal efforts to appeal fell within the statutory bounds and fulfilled the essential requirements.

2. The transfer of functions was made by the Commodity Futures Trading Commission Act of 1974, Pub.L. 93–463, 88 Stat. 1389, which amended the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.* (Supp. IV 1974). The Commission's general sphere of activity is described in the recent decision of the Seventh Circuit in *Silverman v. Commodity Futures Trading Commission,* 549 F.2d 28, decided Feb. 16, 1967.

Sections 411 and 412 of the Commodity Futures Trading Commission Act, 88 Stat. 1414, provided that pending administrative proceedings were (1) to be transferred to the Commission for completion and (2) to be disposed of pursuant to the applicable provisions of the Commodity Exchange Act in effect prior to the effective date of the Commission Act.

■ There is now no doubt that it is a violation of the Commodity Exchange Act for an account executive in the commodity brokerage business intentionally to carry on trading transactions not authorized by his customer. Section 4b of the Act, 7 U.S.C. § 6b, makes it unlawful for the employee of any member of a board of trade or commodity exchange "to cheat or defraud or attempt to cheat or defraud" a customer.[3] This has been administratively held to cover deliberate, wilful, unauthorized trading by a commodities broker for the account of his customer (*see, e. g. George Rex Andrews,* 32 Agri.Dec. 553 (1973)), and we have no more reason to disagree with that reading than did the Seventh Circuit which the other day affirmed a Commission determination against another former employee of Conti-Commodity Services found to have engaged in similar conduct. *Silverman v. Commodity Futures Trading Commission,* 7th Cir., 549 F.2d 28, decided February 16, 1977. Rather, the issues we have to face are whether (1) the evidence supports the Commission's determination against Haltmier; (2) he was accorded his procedural rights; and (3) the sanction imposed by the Commission is to be sustained.

### I.

■ Unlike most other legislation providing for judicial review of agency decision, the Commodity Exchange Act (as carried forward by the Commodity Futures Trading Commission Act) declares that "the findings of the Commission as to the facts, if supported by the weight of evidence, shall * * * be conclusive." 7 U.S.C. § 9. The "weight of evidence" means "the preponderance" or "greater weight of the evidence" (*see, e. g., Kent v. Hardin,* 425 F.2d 1346, 1349 (5th Cir. 1970)), but the court's function "is something other than that of mechanically reweighing the evidence to ascertain in which direction it preponderates; it is rather to review the record with the purpose of determining whether the finder of the fact was justified, *i. e.* acted reasonably, in concluding that the evidence, including the demeanor of the witnesses, the reasonable inferences drawn therefrom and other pertinent circumstances, supported his findings." *Great Western Food Distributors, Inc. v. Brannan,* 201 F.2d 476, 479–80 (7th Cir. 1953); *Cargill, Inc. v. Hardin,* 452 F.2d 1154, 1163–64 (8th Cir. 1971), *cert. denied,* 406 U.S. 932, 92 S.Ct. 1770, 32 L.Ed.2d 135 (1972). It is under these standards that we have appraised the record.

Petitioner Haltmier was, as we have said, an account executive in the New York office of Conti-Commodity Services which was a member of the Chicago Board of

---

**3.** Section 4b, 7 U.S.C. § 6b, provides in relevant part:

It shall be unlawful (1) for any member of a contract market, or for any correspondent, agent, or employee of any member, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce, made, or to be made, on or subject to the rules of any contract market, for or on behalf of any other person, or (2) for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, made, or to be made, on or subject to the rules of any contract market, for or on behalf of any other person if such contract for future delivery is or may be used for (a) hedging any transaction in interstate commerce in such commodity or the products or by-products thereof, or (b) determining the price basis of any transaction in interstate commerce in such commodity, or (c) delivering any such commodity sold, shipped,

or received in interstate commerce for the fulfillment thereof—

(A) to cheat or defraud or attempt to cheat or defraud such other person;

(B) willfully to make or cause to be made to such other person any false report or statement thereof, or willfully to enter or cause to be entered for such person any false record thereof;

(C) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order or contract or the disposition or execution of any such order or contract, or in regard to any act of agency performed with respect to such order or contract for such person; or

(D) to bucket such order, or to fill such order by offset against the order or orders of any other person, or willfully and knowingly and without the prior consent of such person to become the buyer in respect to any selling order of such person, or become the seller in respect to any buying order of such person.

Trade and other boards designated as contract markets under the Commodity Exchange Act. Haltmier was paid by percentages of the commissions made on the transactions he undertook. Early in 1972 there was transferred to him the account of Albert Millet, a customer of the firm who had deposited $5,000 in his account. Mr. Millet was interested in soybean futures with an eye toward making a long-term capital gain, but he was dissatisfied with the free-and-easy way his account had been handled by the previous account executive.[4] Millet testified that he directed Haltmier first to liquidate the account so that he could start all over, and then to buy on margin as many soybean futures contracts with a delivery date six months away as could be done with the $5,000 account. Haltmier was to make additional purchases of this type of soybean futures contract if the market went up; if the market declined and more margin was needed, Haltmier was to get in touch with a Long Island friend of Millet's—Millet was going abroad for an extended stay—who could supply up to $500 of the required additional margin; if still more was needed, Haltmier was to sell one or more of the soybean contracts and use the proceeds.

Haltmier did start all over, buying several soybean futures of six months or more with the $3,000 balance in the account plus $2,000 extra put into it by Millet. The latter then went overseas for several months, leaving an address in England to which the monthly statements and the purchase-and-sale notations were to be sent. While he was away, Haltmier engaged on his behalf in a large number of transactions (1) in commodities other than soybean futures, and (2) in short-term rather than long-term soybean purchase-and-sales, in which the future was held no longer than a few weeks (and often for only one day).

Statements of these transactions were sent, not to England, but to the home of the Long Island friend, who was also away from home much of the time, and the mail therefore piled up in the post office. Millet did receive in England one hand-written letter from Haltmier which he said he found illegible. The extent and type of the activity in Millet's account was discovered when his friend retrieved the Conti mail at the Long Island address in the late summer of 1972. Millet then directed that the account be purged of everything except long-term soybean futures, and, shortly thereafter, he closed it out.

The Administrative Law Judge found that Haltmier had deliberately exceeded his authority with respect both to the transactions other than in soybean futures and also as to those in short-term soybean contracts. The Commission limited its consideration to the non-soybean purchases-and-sales which it found clearly unauthorized by Millet and plainly not within the petitioner's scope of discretion.[5] Accordingly, since we are to review the Commission's findings, not those of the Administrative Law Judge, we restrict our evaluation to that phase.

Millet's testimony squarely supports the Commission's findings. In addition to the affirmative instructions (outlined above) which he gave Haltmier, he told the latter: "I don't want any of this nervous business of spreads, purchasing pork bellies and cocoa and whatever, I just want as many futures, six months in the future, as the money will permit" and he "repeated this over and over and over again, and the only discretionary power he [petitioner] was to have was to sell a contract in case my margin was not high enough." The Administrative Law Judge, who heard all the testimony, expressly gave "more credence" to Millet than to Haltmier; the Commission

4. The prior account executive was Jeffrey Silverman who was also sanctioned by the Commission for unauthorized dealings (with customers other than Millet). See *Silverman v. Commodity Futures Trading Commission, supra,* 7th Cir., 549 F.2d 28, decided Feb. 16, 1977.

5. Petitioner mistakenly asserts that the Commission absolved him in the soybean transactions. We read its opinion, rather, as confining its consideration to the non-soybean dealings because there was no possible doubt as to those, and they were sufficient to show a violation of the statute.

also accepted this testimony, and we have no reason at all to reject or downgrade it. Petitioner claims that Millet perjured himself—mainly because he testified that he once saw Haltmier at the latter's office while petitioner thought all communication was over the telephone, though neither witness was absolutely sure—but there is not the slightest ground for this allegation or any reason to disbelieve Millet's repeated indication that he clearly gave Haltmier directions to limit the activity in his account to soybean futures. In fact, though petitioner testified, rather generally, that he thought he was doing what his customer would want in order to make a profit, he agreed under questioning that he had not received authority to trade in other commodities simply because he considered them "really good" prospects. He also concurred, on examination by the Administrative Law Judge, that it was neither necessary nor authorized, in order to preserve Millet's soybean position in a declining market, to "go in a subsequent date and buy long another commodity or sell short another commodity." Moreover, Haltmier managed Millet's account as if it was a full-fledged "discretionary account," although he knew of the Conti firm's policy that no such account would be accepted unless there was a written authorization from the customer (indisputably absent here), and the account was at least $10,000 (Millet's was slightly over $5,000).

■■ All this supports the Commission's conclusion that petitioner, deliberately and intentionally, undertook numerous unauthorized transactions, knowing them to be unauthorized but hoping that they would turn out profitably and thus pass muster with the client. There is nothing substantial to detract from this determination that Haltmier knowingly engaged in an unauthorized market gamble with Millet's money. Petitioner harps on some minor factual inaccuracies in the opinions of the Administrative Law Judge and of the Commission (such as the number of long-term soybean futures originally purchased for Millet's account, and the margin requirements at a particular time) but none of these errors could affect the result or the crucial findings. Where as here the basic determination is fully supported, immaterial mistakes of this kind will not suffice to torpedo the administrative decision. *Braniff Airways, Inc. v. Civil Aeronautics Board,* 126 U.S. App.D.C. 399, 379 F.2d 453, 465–66 (1967).

■ Nor is it important that Haltmier may not have had an evil motive or an affirmative intent to injure his customer, or that he did not subjectively want to cheat or defraud Millet. It is enough that he acted deliberately, knowing that his acts were unauthorized and contrary to instructions. Such knowing, intentional conduct made his acts wilful, and therefore his violations of the statutory prohibition against cheating or defrauding the customer were wilful, in the accepted sense for infractions of this type. *See Silverman v. Commodity Futures Trading Commission, supra,* 7th Cir., 549 F.2d 28, decided Feb. 16, 1977; *George Steinberg and Son, Inc. v. Butz,* 491 F.2d 988, 994 (2d Cir.), *cert. denied,* 419 U.S. 830, 95 S.Ct. 53, 42 L.Ed.2d 55 (1974); *Goodman v. Benson,* 286 F.2d 896, 900 (7th Cir. 1961); *Eastern Produce Co. v. Benson,* 278 F.2d 606, 609 (3rd Cir. 1960).

## II.

■ Petitioner's major assault on the procedural fairness of the proceeding is the wholesale charge that both the Administrative Law Judge and the Commission were biased against him. There is no substantial basis for this reiterated assertion. That both triers of the facts may have made some minor factual errors is surely not sufficient—or few tribunals would escape this kind of censure. *Cf. Hendrix Mfg. Co. v. National Labor Relations Board,* 321 F.2d 100, 103 (5th Cir. 1963). Obviously, it does not prove prejudice, given this record, that Millet was believed and little credit given to Haltmier's generalities that he thought his customer would agree to what he was doing. *See N.L.R.B. v. Pittsburgh Steamship Co.,* 337 U.S. 656, 659–60, 69 S.Ct. 1283, 93 L.Ed. 1602 (1948). Nor is there any support for the claim that the Administrative Law

Judge and Commission counsel took advantage of petitioner's lack of an attorney. So far as we can tell, petitioner has been treated fairly and has been given some special consideration because of his *pro se* status.[6] The Administrative Law Judge's recommendation of a five-year suspension may show a tendency to severity but it does not demonstrate any personal bias against Haltmier.

The dissenting Commissioner would have remanded the case for a rehearing before another administrative law judge because of an incident which occurred toward the close of the hearing while everyone was waiting for the duplication of some exhibits. In petitioner's presence, Mr. Millet, his Long Island friend (also a witness), and the Administrative Law Judge had a lengthy conversation about a mutual friend of the three of them. The dissenting Commissioner agreed that there was "no evidence of any impropriety stemming from the conversation" but thought it best to have a new hearing to remove any doubt of partiality or bias. From all that we know the conversation was wholly innocuous, and our antennae do not sense any substantial hint of bias in a spontaneous, personal, open conversation, while petitioner was present, about an individual and a subject wholly foreign to the hearing.

### III.

█ The Commission's sanctions of an eighteen-month suspension from all trading on a contract market and a cease and desist order against making unauthorized transactions for a customer (or otherwise defrauding and cheating customers) fall within the statutory bounds. Under Section 6(b) of the Commodity Exchange Act, as amended, 7 U.S.C. § 9, the Commission, where it has been shown "[u]pon evidence received" that a charged person "is violating or has violated any provisions of [the Act]" may "prohibit * * * [that] person from trading on or subject to the rules of any contract market and require all contract markets to refuse such person all trading privileges thereon for such period as may be specified in the order * * *." Similarly, proof of violation of any of the provisions of this Act," after "notice and hearing," authorizes the Commission to "make and enter an order directing that such person shall cease and desist therefrom." Section 6(c), 7 U.S.C. § 13b. It is old law, of course, that an agency sanction within statutory limits can be upset only if it reflects an abuse of discretion. *American Power & Light Co. v. Securities and Exchange Commission*, 329 U.S. 90, 112–13, 67 S.Ct. 133, 91 L.Ed. 103 (1946); *Butz v. Glover Livestock Commission Co.*, 411 U.S. 182, 185–86, 93 S.Ct. 1455, 36 L.Ed.2d 142 (1973).

█ The attack here centers on the eighteen-month suspension. It is said that shorter suspensions have been imposed in the past for comparable violations. No proof of this is given, and in any event the Commission, created to improve enforcement in the area of commodity trading, would not be bound by its predecessor's practice. *Cf. Butz v. Glover Livestock Commission Co., supra*, 411 U.S. at 186, 187, 93 S.Ct. 1455; *G. H. Miller & Co. v. United States*, 260 F.2d 286, 296 (7th Cir. 1958), *cert. denied*, 359 U.S. 907, 79 S.Ct. 582, 3 L.Ed.2d 572 (1959). Mr. Haltmier's status as a "first offender", though relevant, is not conclusive against the validity of the sanction where the record shows a serious, intentional violation vis-a-vis a customer. *Cf. Fink v. Securities and Exchange Commission*, 417 F.2d 1058, 1060 (2nd Cir. 1969); *Vanasco v. Securities and Exchange Commission*, 395 F.2d 349, 353 (2d Cir. 1968). Nor was the year-and-a-half suspension disproportionate to the offense which encompassed, over a period of some three and one-half months, a goodly number of wholly unauthorized transactions in wheat, cotton,

---

6. Petitioner says that he was deliberately denied personal copies of several of the exhibits. The Commission answers that this is not so; in any event, those exhibits were available to Haltmier at the Commission's office in Washington and, during the appeal to the court, in the office of the clerk of this court. Petitioner has not shown that he was harmed by not having his own individual copies, if that was so.

and potatoes, not to mention soybean oil and soybean meal—all on behalf of a customer who had made it very clear that he wanted to restrict his dealings to soybean futures.

Perhaps petitioner's most appealing contention is that, from the time he was fired by Conti in September 1974 because of the administrative complaint against him, he has been unable to obtain employment in the commodities brokerage business due to the proceeding, and thus has suffered a "de facto" suspension of much more than eighteen months; he adds that his sole income over the past ten or more years has been from trading commodity futures. This type of personal detriment, it need not be spelled out, is suffered by many persons who commit derelictions resulting in civil or other sanctions, but "the necessity of protection to the public far outweighs any personal detriment resulting from the impact of the applicable laws." *Associated Securities Corp. v. S.E.C.*, 283 F.2d 773, 775 (10th Cir. 1960).

This leads us to the one aspect of the suspension which has given us pause. That sanction bars Haltmier, not only from acting on behalf of customers, but also from commodities trading for himself personally. He tells us that his livelihood has come in part from his own personal trading; and we know that his violation was deceit of a customer not an impropriety in the act of trading itself. It does not necessarily follow that one who deceives a customer by unauthorized trading will commit delinquencies when buying and selling for himself. In this instance, however, we are not persuaded that the Commission abused its discretion. Petitioner's violation was a serious one and a relatively severe penalty could be thought to be needed, both as a general signal and to keep Haltmier himself within the confines of trading rules and regulations. In addition, allowing petitioner to deal for himself might well permit him to use personal dealing as a cover for representing others.

Nevertheless, though we uphold the full sanction in this case, we remind the Commission that the Act does not compel it to impose across-the-board suspensions automatically whenever any violation is shown, and that it has, and should exercise, discretion in the individual case to determine how much of the full statutory remedy it should invoke. The agency's discretion as to the length of a suspension, extends also to the type and extent of the suspension, as well as to its choice among the various remedies the statute authorizes. See, generally, *Amalgamated Local Union 355 v. N.L.R.B.*, 481 F.2d 996, 1006–1009 (2d Cir. 1973). It would be well if the Commission revealed in its opinions that it had exercised the discretion it possesses.

Affirmed.