Hayden McILROY, Appellant,

v.

Thomas H. DITTMER and Ray E.
Friedman & Company, a
Corporation, Appellees.

No. 83–1902.

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 10, 1984.

Decided April 11, 1984.

E.J. Ball, Ball, Mourton & Adams, Fayetteville, Ark., James L. Fox, Donald P. Colleton, Abramson & Fox, Chicago, Ill., for appellant.

William H. Sutton, Larry W. Burks, Elizabeth J. Robben, Friday, Eldredge & Clark, Little Rock, Ark., for appellees.

Before HEANEY, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and BRIGHT, Circuit Judge.

BRIGHT, Circuit Judge.

Plaintiff-appellant Hayden McIlroy appeals from an adverse judgment of the

district court,[1] contending that the trial judge improperly instructed the jury. Having carefully examined the record, including the lengthy trial transcript, we conclude that any errors in the instructions were, in the context of this case, harmless. Accordingly, we affirm the judgment of the district court.

I.

This lawsuit arises from transactions in cattle futures conducted by the defendant commodity brokerage firm Roy E. Friedman & Co. ("Refco") on behalf of plaintiff-appellant McIlroy in 1979. McIlroy's relationship with Refco began in May 1978, when he commenced trading cattle futures through the firm, and lasted until March 1981, when he closed his account. During the life of the account, McIlroy realized a net profit of $865,410.38. McIlroy alleges, however, that improper actions on the part of Refco and defendant-appellee Thomas H. Dittmer[2] deprived him of an additional $800,000 in profits that he would have realized had his account been traded differently during August 1979. (Until the 27th of that month, McIlroy maintained a short position in the futures market for October and December live cattle, in the face of rising cattle prices; it is undisputed that had he abandoned his short position earlier, he would have avoided the substantial paper losses his account sustained in August.)

McIlroy's theory of recovery rests on his assertion that Robert ("Red") Bone, the Refco representative in Springdale, Arkansas who placed all the orders for McIlroy's account, promised McIlroy that he would trade McIlroy's account in exactly the same way that Dittmer traded those accounts over which Dittmer had discretionary control. McIlroy contends that Bone's failure to place McIlroy's account in a long position in August 1979 (a time when, it later emerged, Dittmer's accounts were long) contravened their oral agreement, and thus violated both section 4b of the Commodity

Exchange Act, 7 U.S.C. § 6b, and the common-law fiduciary duty.

The district court submitted McIlroy's Commodity Exchange Act and fiduciary duty claims to the jury, which found in favor of Refco and Dittmer. On appeal, McIlroy contends that the trial court committed a number of reversible errors in instructing the jury.

II.

A.  *Willfullness and Intent under Section 4b.*

Section 4b of the Commodity Exchange Act makes it unlawful for a member of a contract market, with respect to persons for whom it trades in the market,

(A) to cheat or defraud or attempt to cheat or defraud such other person;

(B) willfully to make or cause to be made to such other person any false report or statement thereof, or willfully to enter or cause to be entered for such person any false record thereof;

(C) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order or contract or the disposition or execution of any such order or contract, or in regard to any act of agency performed with respect to such order or contract for such person * * *.

As part of his instructions to the jury, the judge read the portions of the statute quoted above. He also gave the following instruction on the meaning of "willfully" in section 4b(B) and (C):

An act is done "willfully" if done voluntarily and intentionally, and with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or to disregard the law.

■ We agree with McIlroy that proof of willfullness within the meaning of section 4b(B) and (C) does not require a showing of "evil motive or affirmative intent to injure [the] customer."  *Haltmier  v.*

---

1.  The Honorable Henry Woods, United States District Judge for the Eastern District of Arkansas.

2.  Dittmer was, during the relevant period, the sole owner of Refco, and held the position of president, chairman, and director.

*CFTC*, 554 F.2d 556, 562 (2d Cir.1977). On the other hand, "bad purpose either to disobey or to disregard *the law*" is not the same thing as "evil motive or affirmative intent to injure *the customer*," the element the *Haltmier* court held unnecessary to establish a violation of section 4b.

▉ Though the trial judge might have expanded his instruction to include the language from *Haltmier*, which McIlroy requested, we cannot say that his failure to do so amounts to reversible error. Trial judges have a considerable measure of discretion in framing jury instructions, and need not adopt the exact language proffered by the parties. *United States v. Hopping*, 668 F.2d 398, 400 (8th Cir.1982). An instruction that included the *Haltmier* language might have been a better instruction than that given by the district court, but *Haltmier* does not establish that the instruction given in the present case was improper. Moreover, even if the instruction given was incorrect, no prejudice is shown to have resulted from it. *See generally* part III, *infra*. We conclude, then, that the instruction on the meaning of "willfully" does not constitute grounds for reversal.

McIlroy also argues that, because section 4b(A), unlike section 4b(B) and (C), does not contain the word "willfully," the judge erred in refusing to instruct the jury that

proof of "intent" is not required to show cheating or defrauding of a customer under section 4b(A) of the Commodity Exchange Act. It is sufficient to show conduct which breaches the broker's fiduciary duty to the customer.

We reject this claim. Section 4b(A) prohibits "cheat[ing]," "defraud[ing]," and "attempt[ing] to cheat or defraud." The words of the statute themselves negate any inference that Congress meant to proscribe unintentional acts under section 4b(A). *See CFTC v. Savage*, 611 F.2d 270, 283 (9th Cir.1979) ("to be charged with a violation of 4b(A) [one] must have known that he was cheating"); *Master Commodities, Inc. v. Texas Cattle Management*, 586 F.2d 1352, 1355–56 (10th Cir.1978) (section

4b "seems clearly aimed at intentionally deceptive conduct"). Indeed, the words "cheat" and "defraud" themselves imply a degree of intentionality that would probably render the inclusion of "willfully" in section 4b(A) superfluous.

▉ McIlroy argues that "the kind of benign unintended carelessness which frequently occurs in large corporate operations" might constitute a violation of section 4b(A). We reject that argument. Establishing a violation of section 4b(A) requires proof of something more than mere carelessness. Here the trial court instructed the jury in terms of cheating or defrauding a customer, taking the language directly from section 4b(A). The trial court was not bound to modify that statutory language by aiding the "no-intent" language requested by McIlroy.

B. *Lack of Specificity in Certain Instructions.*

McIlroy requested a number of instructions that defined specific kinds of conduct to be violations of section 4b. We consider each of these instructions in turn.

Two of the requested instructions are premised on McIlroy's contention that Dittmer was intentionally manipulating the market for cattle futures in August 1979. Our review of the record reveals, however, that McIlroy utterly failed to establish such manipulation. Since the evidence does not support the theory underlying the two instructions, the judge correctly refused to give them. *United States v. Hopping, supra*, 668 F.2d at 400.

▉ First, McIlroy requested an instruction that a broker's failure to know and to disclose "material market facts which are reasonably ascertainable" constitutes a violation of section 4b. McIlroy argues that Dittmer was manipulating the futures market through his trading in cattle and futures, that any reasonable investor would have attached significance to Dittmer's activities, and that therefore Refco should have informed even its discretionary customers—who exercised no market judg-

ment of their own—as to every trade Dittmer made. On the record before us, however, we cannot hold that Dittmer's trading activities were manipulative or otherwise improper, or that they constituted material market facts that every commodities broker was obligated to know and to disclose to his customers. Nor does information on Dittmer's activities appear to have been "reasonably ascertainable" by commodities brokers in general, or indeed even by Bone.

Second, McIlroy demanded an instruction that a commodity brokerage in a position to influence the price of futures must, under section 4b, disclose its trading activities in advance to its customers. We think the evidence simply fails to establish that Dittmer or Refco was in such a position.

With respect to both of the requested instructions, we think the more general instruction the judge gave on fiduciary duty adequately informed the jury as to Refco's common-law obligations to its customers, in light of the evidence produced.[3]

■ Third, McIlroy requested an instruction that a commodity broker violates section 4b by selling futures for a discretionary customer at the same time as it buys such futures for itself ("trading opposite"). McIlroy contends that Refco violated the law by permitting Bone to put his discretionary accounts in a short position at the same time as Dittmer put the accounts he supervised in a long position. Although in some circumstances a brokerage house does violate the securities or commodities laws by advising its customers to sell the

very interests it is itself simultaneously buying, or to buy what it is selling, *see Alton Box Bd. Co. v. Goldman, Sachs & Co.*, 560 F.2d 916 (8th Cir.1977), and *Chasins v. Smith, Barney & Co.*, 438 F.2d 1167 (2d Cir.1970), we do not think that that principle is implicated by the facts of this case. The evidence shows only that various Refco brokers, Bone and Dittmer among them, exercised separate trading discretion over the accounts committed to the individual supervision of each of them. *See* pp. 105–106 *infra.*

One broker's trading his discretionary accounts differently from those of another broker does not, by itself, violate section 4b. Though a conspiracy among brokers to manipulate discretionary accounts so as to cheat or defraud customers would violate section 4b, the evidence discloses nothing of the kind here. Bone and Dittmer both traded their personal accounts in just the way they traded their discretionary customers'. We refuse, without more evidence, to read anything sinister into the fact that Bone read the market differently from Dittmer, and thus took a different market position for himself and his customers than Dittmer did. Nor will we hold that section 4b absolutely prohibits a commodities firm from allowing its individual brokers to exercise their own best judgment as to how to invest the discretionary funds entrusted to them.[4] Yet that is the precise import of McIlroy's proffered instruction in this case.

■ We think, rather, that the heart of McIlroy's case lies in his theory of unauthorized trading. He requested the

---

3. The judge instructed the jury as follows:

A fiduciary duty arises from a fiduciary relationship. A fiduciary relationship is one subsisting between two persons in regard to a business, contract, or piece of property, of such a character that each must repose trust and confidence in the other and must exercise a corresponding degree of fairness and good faith. Out of such a relation, the law raises the rule that neither party may take selfish advantage of his trust, or deal with the subject-matter of the trust in such a way as to benefit himself or prejudice the other except in the exercise of the utmost good faith and with the full knowledge and consent of that other.

4. Where a customer directs one broker to trade an account in the manner directed by another broker, failure so to trade might constitute a breach of fiduciary duty and a violation of the Commodity Exchange Act, but only because it amounts to disregard of customer instructions, not because there is anything inherently suspect in different brokers trading their respective customers' accounts differently. Indeed, the broker who is instructed to trade a customer's account in the manner another broker directs has no "discretionary" authority at all. But McIlroy's proffered instruction on unauthorized trading, not his instruction on "trading-opposite," addresses that situation.

judge to instruct the jury that "[a] commodity brokerage firm which agrees to trade a customer's account in a particular way must trade the account in the agreed upon way," and that failure to do so breaches the firm's fiduciary duty and violates section 4b. We think this is an accurate statement of the law. *See Haltmier v. CFTC, supra,* 554 F.2d 556; *Silverman v. CFTC,* 549 F.2d 28 (7th Cir.1977). McIlroy alleged that Bone promised to trade his account exactly the way that Dittmer traded the accounts Dittmer supervised. In light of the evidence McIlroy presented in support of this allegation, the judge should have given the proffered instruction on unauthorized trading. But we conclude, for the reasons set forth in part III, *infra,* that his failure to give such an instruction was harmless error in the context of this case.

### C. *Other Instructions.*

McIlroy's other allegations of error have little merit.

■ First, he contends that the judge erred in reading, along with section 4b(A), (B), and (C), the following sentence from section 4b:

> Nothing in this section or in any other section of this chapter shall be construed to prevent a futures commission merchant or floor broker who shall have in hand, simultaneously, buying and selling orders at the market for different principals for a like quantity of a commodity for future delivery in the same month, from executing such buying and selling orders at the market price.

We agree with McIlroy that this sentence has no relevance to anything at issue in this lawsuit. Nevertheless, McIlroy has failed to demonstrate that its inclusion in the instructions prejudiced or confused the jury. We conclude that it does not amount to reversible error.

■ McIlroy contends that the judge erred in failing to tell the jury that section 4b covers not only trading in commodities, but also the establishment of customer accounts. McIlroy, however, does not claim to have been harmed by the *establishment* of his Refco account; to the contrary, he concedes that he benefited handsomely from it. Rather, the damages McIlroy alleges resulted entirely from *trading* in the account during August 1979. We think the judge did not err in failing to give the proposed instruction on fraud or deceit in the establishment of accounts, in view of the substantial irrelevance of such an instruction to McIlroy's central claim.

■ McIlroy also argues that the judge erred by simply explaining to the jury what constitutes agency, rather than telling the jury that Bone *was* Refco's agent as a matter of law. We conclude, on the basis of the record, that the trial judge should have given the instruction McIlroy requested. At trial, however, Refco did not dispute that Bone was its agent. Thus it is highly unlikely that the jury vested its verdict, as to Refco, on absence of agency. The judge's failure explicitly to tell the jury that Bone was Refco's agent must therefore be deemed harmless error in the context of this case.

■ Finally, McIlroy says that in addition to instructing the jury that McIlroy had to prove his case by the preponderance of the evidence, the judge should have given the following instruction:

> If you find that a fiduciary relationship existed between plaintiff and Refco, the law presumes that any transaction in which Refco has profited at the expense of McIlroy is fraudulent. Refco may rebut this presumption only by clear and convincing proof that it exercised good faith and has not betrayed the confidence reposed in it.

Whatever the accuracy of this proposed instruction as a statement of the law, the judge properly refused to give the instruction in this case. None of the evidence showed that Refco "profited at the expense of McIlroy." McIlroy's trading losses did not constitute gain to Refco or Dittmer. Nor is there any evidence whatsoever that any commissions Refco received for executing trades for McIlroy's account were im-

proper, or would not have been generated had Bone put McIlroy in a long position at the beginning instead of the end of August. McIlroy simply fails to show that Refco or Dittmer profited in any way from McIlroy's losses. Therefore, the judge properly refused to instruct the jury that the burden of proof might shift to the defendants.

III.

■ Though we agree with McIlroy that the jury instructions were in some respects less than ideal, we do not believe that errors in the instructions resulted in prejudice to McIlroy. We think the jury had a fair opportunity to consider the evidence in light of the theory of recovery McIlroy advanced—that Refco promised to trade his account in unison with Dittmer's trades, and failed to do so, to McIlroy's harm.

In our view, had better instructions been given, the jury would more probably than not still have reached the same result. *See Haddad v. Lockheed California Corp.,* 720 F.2d 1454, 1459 (9th Cir.1983) ("when an appellate court ponders the probable effect of an error in a civil trial, it need only find that the jury's verdict is more probably than not untainted by the error"). Therefore, we think retrial of the case would serve no useful purpose.

Under both the statutory and the common-law theories that McIlroy advanced, his recovery depends upon his establishing that Bone promised to trade McIlroy's account in exactly the way that Dittmer traded the accounts under his discretionary control. Furthermore, McIlroy must show that Bone's failure to trade his account in that manner resulted in losses to McIlroy. We think the evidence on both points extremely weak.

As for Bone's alleged oral promise to trade McIlroy's account in unison with Dittmer, the most the evidence shows is that Refco's various brokers conferred from day to day in an attempt to coordinate trading strategy. The various brokers, in a daily telephone conference call, to which McIlroy himself often listened, shared their views as to future market trends. Each broker, however, remained free, with respect to any accounts over which he had authority, to pursue the trading strategy he thought advisable, even if it differed from the apparent consensus of the other brokers. McIlroy's own testimony reveals that he understood that the various Refco brokers merely tried to reach a consensus, and that trading strategy was not dictated centrally from the Chicago office by Dittmer or anyone else.

In response to interrogatories, when asked to "[s]tate precisely the scope of the discretionary authority which plaintiff granted to Bone," McIlroy declared, "Red Bone had *total* discretionary authority over the aforesaid account." (Emphasis added) Though McIlroy appeared to retreat somewhat from this answer in his trial testimony, even his strongest assertion that Bone promised not to exercise discretion, but to trade exactly as Dittmer traded, is tentative and uncertain:

> I told Mr. Bone that if—that REFCO could trade that account for me as long as they were trading it the way they were trading it * * * [a]s long as the officers were trading in unison, as long as the information—as long as REFCO Chicago office was giving the advice, as long as they were establishing their positions, everybody was establishing their positions together and this information was being given to Springdale office and I was—you know, I was certainly willing to go along with it.

The most the evidence shows is that Bone represented to McIlroy that Refco's various officers exchanged information in an attempt to coordinate market strategy, and that Bone's discretionary trading of McIlroy's account would be guided and informed by the consensus of Refco brokers which might from time to time emerge from the telephone conferences. Not even McIlroy's own testimony, however, indicates that Bone promised to trade exactly as Dittmer traded, exercising no discretion on his own. Nor does McIlroy's testimony give reason to believe that Bone ever represented that he had continuing knowledge

as to how Dittmer, personally, was trading the accounts he supervised. Bone consistently denied having any access to such information. Moreover, as noted, McIlroy declared unqualifiedly in interrogatories that Bone had complete discretionary authority over the McIlroy account.

Throughout the period in question, Bone was trading his personal account in unison with McIlroy's account. Thus Bone made money when McIlroy made money, and lost money when McIlroy lost money. Though McIlroy now complains that Refco and Dittmer should compensate him for trading losses his account sustained in August 1979, because Bone was then unknowingly trading the McIlroy account differently from the way Dittmer was trading the accounts under his control, it is undisputed that McIlroy made (and Dittmer's accounts lost) money from April through July 1979, when Bone was also trading the McIlroy account differently from the way Dittmer was trading the accounts under his control.

McIlroy testified that he was aware from day to day during August 1979 that maintaining his account in a short position resulted in a gradual erosion of the account's value. Throughout the period, he discussed the market with Bone, and, though McIlroy admits that he knew he could have stopped his losses at any time by ordering the account closed or by switching to a long position, he decided to follow Bone's advice and maintain his short position. Bone testified that Dittmer in late August urged him to abandon the short position for the various accounts he supervised. But, Bone continued, Dittmer's advice was only one of the factors he normally considered in determining his market strategy. Moreover, Bone knew that from April through July, Dittmer lost money by maintaining a long position, while Bone (and McIlroy, as a result of Bone's discretionary supervision of his account) made money by staying short. Bone maintained his own and McIlroy's short position, despite Dittmer's contrary advice, until August 27, simply because he believed that a short position continued to represent, as it had throughout the spring and summer, the soundest investment strategy.

We find the record devoid of evidence to support McIlroy's claim that Refco and Dittmer "double-crossed" him by knowingly and deliberately permitting him to maintain a short position at a time when Dittmer maintained the accounts he supervised in a long position. In fact, McIlroy (on Bone's advice) was short and Dittmer long for a period of many months, during most of which Bone's strategy made McIlroy money, and Dittmer's contrary strategy lost Dittmer money. When in late August Dittmer initially urged Bone to abandon the short position, Bone exercised his own judgment and stayed short a few more days. Only in hindsight can McIlroy contend that Bone's advice was misguided; by following his own judgment, rather than Dittmer's, Bone had in fact made McIlroy a great deal of money during the preceding several months.

Our exhaustive review of the record leads us to conclude, therefore, that the evidence is extremely weak that Bone ever promised to trade McIlroy's account in lockstep with Dittmer's trades, and that, even if such an agreement existed, its breach was the cause of McIlroy's trading losses. It is in light of this evidence that we hold any defects in the jury instructions to have been harmless error in this case. We think it highly unlikely that the giving of additional instructions, or the modification of those instructions actually given, would have changed the result. Taken as a whole, the instructions gave the jury an adequate and fair understanding of McIlroy's theory of the case. None of the alleged errors constitutes grounds for reversal.

Accordingly, we affirm the judgment of the district court.