1402

FARMLAND INDUSTRIES, Appellant,

v.

FRAZIER–PARROTT    COMMODITIES,
INC. a/k/a Parrott Corporation and/or
d/b/a Parrott Corporation;   Heinold
Commodities, Inc.; DEKALB Corpora-
tion,  formerly  known  as  DEKALB
Agresearch, Inc.;  Christopher R. Par-
rott; Horace Seixas; John Dunn; Rob-
ert Wakefield; John Fenley;  Charles
Waters;  Ernest Pierce, Appellees.

No. 87–2653.

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 19, 1988.

Decided April 13, 1989.

Rehearing Denied May 5, 1989.

See also, 8th Cir., 806 F.2d 848.

Alvin D. Shapiro, Kansas City, Mo., for appellant.

Thomas Deacy, Kansas City, Mo., for Frazier–Parrott.

Dan K. Webb, Chicago, Ill., for Seixas and Dunn.

William Nissen, Chicago, Ill., for Heinold and DEKALB.

Before JOHN R. GIBSON, WOLLMAN and BEAM, Circuit Judges.

JOHN R. GIBSON, Circuit Judge.

Farmland Industries, Inc. brought this suit claiming that several commodity brokerage houses and their agents conspired to defraud it by trading in crude oil futures contracts without Farmland's authorization. Farmland appeals from directed verdicts granted to Heinold Commodities, Inc., a licensed commodities futures broker, and to DEKALB AgResearch, Inc., Heinold's parent corporation, arguing that evidence

which Farmland presented at trial supported its theory that both Heinold and DEKALB actively participated in a scheme to defraud Farmland. Farmland also appeals from a judgment entered upon a jury verdict for Frazier–Parrott Commodities, Inc., Frazier–Parrott president Christopher Parrott, Frazier–Parrott account executive Horace Seixas, and Seixas' brother John Dunn. Farmland contends that with respect to these appellees the district court[1] erred in excluding certain expert testimony concerning agency rules and in framing various jury instructions on commodities fraud. We affirm the judgment of the district court.

Farmland is an agricultural cooperative whose petroleum division in 1985 refined over 2 million barrels of oil per month and had annual sales of $1.2 billion. Its ongoing crude oil inventory averaged 6,300,000 barrels, which in mid–1985 was worth some $170,000,000. In 1983 Farmland's board of directors adopted a futures trading policy which provided for hedging in the oil market to protect against excessive losses in the value of this substantial inventory.[2] In 1985 Farmland gave control over all aspects of its petroleum futures trading program to its employee Ernest Pierce, who with virtually no oversight was responsible for placing trades, generating internal records of each trade, and paying margins and fees to brokers. Pierce could make trades without the approval of any Farmland officer or employee, and it is Pierce's unchecked trading that gives rise to this lawsuit.

Upon his 1985 arrival at Farmland, Pierce searched for an additional brokerage firm to handle Farmland's petroleum futures trading. He had previously dealt with Horace Seixas, a broker associated with Frazier–Parrott, and he therefore selected Frazier–Parrott as Farmland's commodity futures broker. Pierce and Seixas negotiated a commission of $20 per round turn, an amount substantially lower than the rate that Farmland had been paying to other brokers. According to Seixas, after this rate had been agreed upon Pierce demanded that he share $3 of the commission as a "finder's fee," and that because of a divorce and bankruptcy he did not want to receive the money directly. Seixas arranged through his stepbrother, John Dunn, to use a dormant corporation, JES International, to effect payments of the "finder's fee." At trial and on appeal Farmland has insistently characterized these payments as the "secret bribery" of Pierce, intended to sway his loyalty away from Farmland. Pierce, on the other hand, testified that the $2,600 in checks made payable to him and which he cashed, were not "finder's fees" but payment for consulting services rendered to a client of Seixas. Pierce admitted that he never met with or consulted with representatives of JES, but further testified that his trading for Farmland was uninfluenced by any payment.

The history of trading undertaken by Pierce on Farmland's behalf is complex, but for the purposes of this opinion we need not delve into excessive detail. Initially, Farmland's board of directors expressly authorized Pierce to make trades on behalf of Farmland and notified Frazier–Parrott that it had given Pierce this power.[3] During the summer of 1985,

---

1. The Honorable Joseph E. Stevens, Jr., United States District Judge for the Western District of Missouri.

2. The price of oil fluctuates, exposing the owner of a large inventory to potentially large losses from downward price movement. To protect against this, owners of petroleum inventories often "hedge" their value by selling crude oil futures contracts "short" through the New York Mercantile Exchange. In a fully hedged inventory the owner is not subject to loss from market fluctuation because in the event the price of the oil in the inventory should decline, the value

of the short positions in the hedge will increase proportionately.

3. The "delegation of authority" sent by Farmland to Frazier–Parrott stated:
   The undersigned, Mr. Kenneth A. Nielsen, president of Farmland Industries, Inc., hereby delegates to Messrs. Rod LaRue, Caskel Stallard, Charles Walters and Ernest Pierce the authority to enter into contracts and agreements for the purpose of performing the provisions of Farmland's Petroleum Futures Trading Policy as adopted by the board of directors of Farmland Industries, Inc., at its regular meeting held March 29–30, 1983.

Pierce opened four nondiscretionary commodity trading accounts for Farmland at Frazier–Parrott. Pierce made all decisions as to what trades should be made, and implemented these decisions by telephoning his orders to Seixas, who in turn executed the trades. Heinold, under contract with Frazier–Parrott to act as its clearing broker, facilitated the trades by processing orders, maintaining access to the mercantile exchange, and arranging for the transfer of funds. Other traders at Farmland, along with Farmland's management, were not informed of the trading occurring in these accounts. Pierce had arranged affairs so that confirmation slips were diverted so as to escape the attention of Farmland management.

In arguing that the brokerage houses joined with Pierce in a fraudulent scheme, Farmland points to evidence that the brokerages tolerated numerous irregularities in the accounts which Pierce established. Farmland maintains that in opening one account, designated the "JES" account after JES International, an improper tax identification number was used and required papers were never submitted, that trades were switched after the fact from one account to another, and that Frazier–Parrott destroyed order tickets which it was required to maintain by federal regulations.

Through August and September of 1985, the oil market moved up against Farmland's short positions, creating large margin calls in the accounts opened by Pierce. Brokers at Frazier–Parrott spoke to Pierce daily, and, for some time, Pierce was able to make margin payments. On August 22, 1985 Farmland made a margin payment of $350,000 to Frazier–Parrott. On September 6, Farmland transferred an additional $1,000,000 in Treasury bills. On September 23, Christopher Parrott, Frazier–Parrott's president, reviewed Farmland's positions with Pierce and demanded payment on existing margins, which at that time had reached $3.8 million. Pierce, for the first time, disavowed his trades and told Parrott, "This is a matter for the lawyers." The next day Farmland executives learned the full extent of the activity in the Frazier–Parrott accounts when Parrott and Seixas travelled to Kansas City, demanding that Farmland make a margin payment on 2,500 petroleum contracts and saying that if these payments were not made the contracts would be liquidated immediately. Farmland made the payment as requested, and continued to trade actively in accounts opened by Pierce until November 20, 1985.

Farmland proceeded to sue all involved, essentially claiming that Frazier–Parrott and Heinold carried out a scheme to defraud Farmland by bribing its trader Ernest Pierce. At trial, the district court limited testimony from Farmland's expert witness regarding the rules of the Commodity Futures Trading Commission (CFTC); rules Farmland argued the brokerage houses had repeatedly violated. At the close of Farmland's case, the district court directed a verdict in favor of DEKALB on all claims, and in favor of all defendants on Farmland's RICO claim. At the close of all evidence, the district court directed a verdict in favor Heinold. The district court then charged the jury. Although it gave rather broad instructions regarding fraud, the court did not specifically instruct the jury, as Farmland requested, on Farmland's claims for unauthorized trading, bribery, and conspiracy. The jury later returned verdicts in favor of the defendants on all of Farmland's claims. This appeal ensued.

## I.

Farmland contends that the district court erred in granting Heinold a directed verdict, arguing that it presented extensive evidence in support of its theory that Heinold actively participated in a scheme to defraud it. Farmland points to evidence that all opening account documents bore Heinold's name only, that confirmation slips subsequently received by Farmland bore Heinold's name as well as that of Frazier–Parrott, that Heinold facilitated trading in Farmland's accounts by furnishing a Frazier–Parrott broker with an exchange seat, booth and floor space, and that Heinold received and retained Farmland's account payments. According to

Farmland, Heinold improperly opened the JES account without requiring an initial deposit, used a fictitious tax identification number on account forms, and switched trades among Farmland's various accounts. Heinold is further said to have breached its fiduciary duties in mishandling Farmland's margin payments and in failing to investigate the trades initiated by Pierce. Farmland contends that because these acts were contrary to Heinold's own procedures manual, CFTC regulations, and common industry practice, they are sufficient to hold Heinold liable for fraud.

In reviewing the district court's decision to grant a directed verdict against Farmland, we must consider the evidence in a light most favorable to Farmland. *See Loudermill v. Dow Chem. Co.*, 863 F.2d 566, 570 (8th Cir.1988). We may find for Heinold only if "all the evidence points one way and is susceptible of no reasonable inferences sustaining the postion" of Farmland. *See Craft v. Metromedia, Inc.*, 766 F.2d 1205, 1218 (8th Cir.1985) (citations omitted), *cert. denied*, 475 U.S. 1058, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986).

■ From the record before us, we conclude that Farmland failed to establish a submissible case against Heinold. The sole evidence offered was that custom and procedure required Heinold only to inform Frazier–Parrott, as a nonclearing broker, of margin deficiencies in customers' accounts, and that nonclearing brokers such as Frazier–Parrott are by custom under a burden to verify the documentation needed to open an account. Farmland presented no contrary evidence. Farmland in addition presented no evidence that Heinold was involved in or responsible for any wrongdoing or breach of fiduciary duty, or that Heinold harbored the fraudulent intent required for an action under section 4b of the Commodities Exchange Act. *See Greenwood v. Dittmer*, 776 F.2d 785, 789 (8th Cir.1985); *McIlroy v. Dittmer*, 732 F.2d 98, 102 (8th Cir.1984); *see also Merrill Lynch, Pierce Fenner & Smith, Inc. v. Goldman*, 593 F.2d 129, 132 n. 6, 133–34 (8th Cir.) (absent showing of fraud, no private cause of action for violations of margin rules or a broker's house rules), *cert. denied*, 444 U.S. 838, 100 S.Ct. 76, 62 L.Ed. 2d 50 (1979). Farmland neither supported its allegations that Heinold knew of payments to Pierce, nor did it establish that Heinold had cause to know that Pierce's trading was unauthorized. Farmland's expert testified that, owing to the nature of the clearing relationship existing between Heinold and Frazier–Parrott, Heinold had to rely on Frazier–Parrott's directions regarding the wishes of its clients. Both Pierce and his supervisor, Walters, testified that Frazier–Parrott, not Heinold, was Farmland's broker. Both Pierce and Walters also testified that they dealt only with brokers at Frazier–Parrott and that they never contacted anyone at Heinold. Farmland's own internal documents identified Frazier–Parrott as its broker; Heinold was not mentioned. In short, Farmland demonstrated only that Heinold played a limited role, even if a central and essential one, in processing transations and in maintaining records of Farmland's accounts.

■ Farmland also argues vigorously that it established Heinold's liability by demonstrating that on numerous occasions Heinold switched profitable trades into the JES account, controlled privately by Pierce, and unprofitable trades into Farmland's other accounts. Farmland's expert witness testified that these switches were deliberate, constituted a form of "cheating" and unauthorized trading beyond the scope of proper business conduct, and were contrary to CFTC regulations. Tr. Vol. 8, 56. This testimony, however, was elicited in response to a hypothetical question assuming that Seixas directed, and Frazier–Parrott ordered, at least a dozen switches between the Farmland and JES accounts. Frazier–Parrott personnel, both office manager Wisely and employee Susan Slingerland, testified that Frazier–Parrott directed Heinold by telephone and written memoranda to make the switches, which Heinold then performed without investigating the order tickets and other required documentation. In view of the evidence establishing that all switches performed by Heinold were made upon the express authorization of Frazier–Parrott, Farmland's expert testimony can-

not create an inference of direct wrongdoing by Heinold.

Farmland further claims that Heinold conspired with Frazier–Parrott in handling transactions in the JES account, in evading rules of the Commodities Futures Trading Commission, and in violating procedures established by a Heinold policy manual. Farmland has failed to cite support in the record for these generalized charges of conspiracy, however, and we decline to independently search the record for error. *See Holt v. Sarver*, 442 F.2d 304, 307 (8th Cir.1971). In conclusion, the evidence considered in a light most favorable to Farmland is simply insufficient to establish the direct liability of Heinold for its own acts.

Even so, Farmland argues that extensive evidence established Heinold's liability for the acts of others, invoking the antifraud and agency provisions of the Commodities Exchange Act, 7 U.S.C. §§ 4, 6b, and theories of common law agency and conspiracy. Heinold held money for Farmland, maintaining its books accordingly, and Farmland argues that both the common law and federal regulations impose fiduciary duties which Heinold violated by forwarding confirmation notices to Frazier–Parrott rather than sending them to Farmland directly. Farmland further argues that both Heinold and Frazier–Parrott repeatedly contravened policies articulated by Heinold's procedures manual, and that Heinold failed to diligently supervise Frazier–Parrott personnel in violation of CFTC regulations. *See* 17 C.F.R. § 166.3 (1983).

These arguments are also without merit. Any agency relationship between Heinold and Frazier–Parrott cannot be presumed, but must instead be proved by Farmland. *See Dudley v. Dumont*, 526 S.W.2d 839, 843–44 (Mo.App.1975). The only evidence was that Heinold performed services for Frazier–Parrott pursuant to instructions given by Frazier–Parrott, and not vice versa. Heinold had no authority to control employees of Frazier–Parrott, and did not seek to do so. Frazier–Parrott thus had no actual authority to act on behalf of Heinold. *Cf. Scott v. Ford Motor Credit Corp.*, 706 S.W.2d 453, 460–61 (Mo.App. 1985). Neither do the facts cited by Farmland support a finding of apparent authority. *See Empson v. Missouri Highway & Transp. Comm'n*, 649 S.W.2d 517, 523 (Mo. App.1983) (agency relationship not to be implied from "the mere possession of letterheads, billheads, or forms by a purported agent"). Furthermore, even if Heinold's policy and procedures manual is considered to apply to the acts of Frazier–Parrott, failure to follow the provisions of such a manual will not give rise to a cause of action in the absence of independent facts establishing fraud. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Goldman*, 593 F.2d 129, 133–34 (8th Cir.), *cert. denied*, 444 U.S. 838, 100 S.Ct. 76, 62 L.Ed.2d 50 (1979). Finally, Farmland's claim that Heinold failed to supervise adequately its own personnel or that of Frazier–Parrott finds no support in the record. The district court did not err in granting Heinold's motion for directed verdict.[4]

## II.

Farmland maintains that the district court erred in refusing to charge the jury on Farmland's claims of unauthorized trading, bribery, and conspiracy. It argues that it proffered evidence on each of these claims, that it proposed jury instructions on them, and that the district court directed no verdict on any of them. Frazier–Parrott argues in response that the instructions tendered by Farmland failed to outline any cognizable cause of action, failed to state any theory of recovery supported by the record, or stated theories which were adequately submitted to the jury in other instructions. Frazier–Parrott further argues that Farmland waived any claim of error by failing to object to the district court's refusal of the instructions.

---

**4.** On appeal, Farmland also contends that the district court erred in directing a verdict for DEKALB, arguing that Heinold was DEKALB's agent and alter ego. Because we hold that the district court did not err in granting a directed verdict for Heinold, we further hold that it was proper to direct a verdict for DEKALB against Farmland's claims of derivative liability.

## A.

Farmland characterizes its claim for unauthorized trading as central to its case and argues that it was for the jury to determine whether the trades initiated by Pierce were in fact authorized by Farmland. Although Farmland submitted proposed instructions on unauthorized trading, bribery, and conspiracy, Farmland never objected on the record to the court's failure to instruct on these claims. Farmland argues that precedent does not require it to make "reiterative insistence" of an objection to preserve it for appeal. While this argument has some initial appeal, the cases in this circuit are uniformly to the contrary. As we recently stated in *Johnson v. Houser*, 704 F.2d 1049, 1051 (8th Cir.1983):

> The mere tender of an alternative instruction without objecting to some specific error in the trial court's charge or explaining why the proffered instruction better states the law does not preserve the error for appeal.

*See also United States v. Hecht*, 705 F.2d 976, 978–79 (8th Cir.1983); *United States v. Parisien*, 574 F.2d 974, 976 (8th Cir.), *cert. denied*, 439 U.S. 850, 99 S.Ct. 154, 58 L.Ed.2d 154 (1978); *United States v. Phillips*, 522 F.2d 388, 391 (8th Cir.1975). We thus should limit our inquiry as to whether there is a demonstration of plain error, and we are convinced that there is none.[5]

Even if Farmland properly preserved its objections for appeal, its claims for unauthorized trading nevertheless were encompassed by the instructions that the district court gave on common law fraud and fraud under the Commodities Exchange Act (CEA). "Trial judges have a considerable measure of discretion in framing jury instructions and need not adopt the exact language proffered by the parties." *McIlroy v. Dittmer*, 732 F.2d 98, 102 (8th Cir.1984). We have held that "unauthorized trading" constitutes an attempt to cheat or defraud a customer and is a violation of 7 U.S.C. § 6b. *Ray E. Friedman & Co. v. Jenkins*, 738 F.2d 251, 253 n. 4 (8th Cir.1984); *see also Haltmier v. Commodity Futures Trading Comm'n*, 554 F.2d 556, 560 (2d Cir.1977). The trial court in its instructions charged the jury that its verdict must be for Farmland if the jury found that appellees intentionally "cheated or defrauded or wilfully deceived" Farmland. Such language runs closely parallel to that from which the *Haltmier* court and others have derived actions for unauthorized trading. The district court made it clear to the parties that it had framed instructions both to express the intent of the CEA and to make the statute readily understandable to the jury. Study of Farmland's closing argument reveals that Farmland repeatedly argued that it was entitled under the instructions given to recover a verdict against appellants for unauthorized trading. The district court did not err in charging the jury as it did.

## B.

Farmland similarly considers its allegations of "secret bribery" of Pierce to be the "most salient, pervasive aspect of this case," and faults the district court for not adopting its proffered instruction on bribery. Farmland cites no Missouri case to support a civil common law cause of action for bribery, however, and those cases which do discuss the matter treat such claims as presenting claims for fraud. *See Missouri Highway & Transp. Comm'n v. Sample*, 702 S.W.2d 535 (Mo. App.1985). Furthermore, the district court did instruct the jury as to both fraud under the CEA and common law fraud, and Farmland was left free to argue that any payment made to Pierce constituted fraud. Indeed, in closing argument Farmland's counsel repeatedly referred to Frazier–Parrott's alleged bribery of Pierce. The district court did not err in rejecting Farmland's proposed instruction.

---

5. Our holding in *Monahan v. Flannery*, 755 F.2d 678, 683 (8th Cir.1985), is not to the contrary. While in *Monahan* we held that a party preserved error by requesting an instruction, in that case the district court also had marked the proffered instruction as "given." This suggested that only by inadvertence had the instruction not been read to the jury.

## C.

■ While Farmland also faults the district court for not adopting its proffered instruction on conspiracy, Missouri recognizes no separate cause of action for civil conspiracy. *See Bockover v. Stemmerman,* 708 S.W.2d 179 (Mo.App.1986). We have stated that the "doctrine of civil conspiracy extends liability for tort * * * to persons other than the actual wrongdoer * * * but it is the acts causing damage to the plaintiff that give rise to liability for damages, not the conspiracy itself." *Simpson v. Weeks,* 570 F.2d 240, 242 (8th Cir.), *cert. denied,* 433 U.S. 911, 99 S.Ct. 3101, 61 L.Ed.2d 876 (1978). Therefore, although Farmland was entitled to have conspiracy added as an element to verdict directing instructions on its substantive claims, it was not entitled to have a verdict directing instruction based solely on the theory of conspiracy. Because Farmland's proposed instructions did not submit conspiracy as an added element, the district court did not err in rejecting them.

## III.

Farmland maintains that the district court erred in handling its claims under the Commodities Exchange Act. The district court restricted Farmland's expert witness, Leslie Jordan, from testifying regarding CFTC rules. Therefore, Farmland argues, the jury was never properly informed that Frazier–Parrott violated CFTC rules in destroying order tickets, *see* 17 C.F.R. § 1.37, in opening and trading in one account without requiring appropriate documentation, *see* 17 C.F.R. §§ 1.37 and 1.55, or in failing to adequately supervise its brokers and agents, *see* 17 C.F.R. § 166.3. Farmland further claims that the district court's instructions regarding its claims under the CEA, 7 U.S.C. § 6b, were faulty in that they submitted Farmland's claim as if it were one for common law fraud. Farmland asserts that in so doing the district court misstated elements under the CEA of intent, materiality and agency, and ignored altogether provisions of section 6b which prohibit a broker from generating false records.

■ As to Farmland's first contention, we have no doubt that the district court acted properly in ruling that Farmland's expert witness could not testify regarding the requirements of law. *See Adalman v. Baker, Watts & Co.,* 807 F.2d 359, 365–70 (4th Cir.1986). "The special legal knowledge of the judge makes the witness' testimony superfluous. * * * The admission of such testimony would give the appearance that the court was shifting to witnesses the responsibility to decide the case." *Marx & Co. v. Diner's Club, Inc.,* 550 F.2d 505, 510 (2d Cir.), *cert. denied,* 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977). Indeed, despite the district court's ruling, Farmland's counsel continually elicited from its expert testimony that a wide variety of actions taken by appellees were contrary to proper conduct as "prescribed by the CFTC." In fact, of the five CFTC rules to which Farmland alludes in its brief on appeal, its expert expressly testified as to four. The district court neither struck this testimony nor instructed the jury to disregard it. Thus, if anything, the district court was overly permissive in allowing Farmland's expert to so testify.

■ With regard to Farmland's second argument, we recognize that the district court was obligated to instruct the jury as to the law. Farmland cites no cases supporting a private cause of action under CFTC rules, however, and our own search reveals only one circuit court decision suggesting that such a cause of action exists. *See Irvine v. Cargill Investor Services, Inc.,* 799 F.2d 1461, 1462 n. 3 (11th Cir. 1986) (dicta). Conversely, appellees cite several district court cases which hold forthrightly that no private cause of action lies under these rules. *See Fustok v. ContiCommodity Services, Inc.,* 618 F.Supp. 1069, 1073 (S.D.N.Y.1985); *Bennett v. E.F. Hutton Co., Inc.,* 597 F.Supp. 1547 (N.D. Ohio 1984) (no private cause of action under 17 C.F.R. § 166.3 for failure to supervise). We need not decide whether to recognize such a private cause of action, however, because we conclude that the district court's broad instructions afforded Farmland with ample latitude under which to

present its claims that Frazier–Parrott violated both the CEA and CFTC rules and regulations.

The district court instructed the jury that it could find a violation of the antifraud provisions of the CEA, 7 U.S.C. § 6b, if Farmland proved "(1) that the defendant cheated or defrauded or wilfully deceived plaintiff; (2) that the defendant acted with the intent to cheat or defraud the plaintiff; and (3) that plaintiff was thereby damaged." Alternatively, the jury was instructed that Farmland could recover if it "prove[d] that a defendant intentionally failed to disclose material facts which that defendant had a duty to disclose." We will consider this charge adequate if the instructions, read in their totality, are comprehensive, balanced, fundamentally accurate, and not likely to confuse or mislead the jury. *Bode v. Pan American World Airways, Inc.*, 786 F.2d 669, 671–72 (5th Cir.1986). At the instructions conference, the district court stated that it "used what we deemed to be the intent and thrust of the statutes in order to simplify this and make it more readily understandable to the jury." In this instance, we conclude that the instructions given the jury adequately encompassed the cause of action created by the CEA. As to Farmland's claim under the CEA, creation of false records is a form of "cheating" and deceit, and much the same logic applies to Farmland's other claims under the CFTC regulations. Furthermore, Farmland has for the most part failed to demonstrate that any instructional errors resulted in prejudice to it.[6] *Cf. McIlroy v. Dittmer*, 732 F.2d 98, 105 (8th Cir.1984). We thus find Farmland's arguments in this regard to be without merit.

■ Farmland also argues that for the purposes of a CEA claim the district court's instructions to the jury should have defined "materiality" as the "substantial likelihood that a reasonable investor would consider it important in making an investment decision."[7] *See Saxe v. E.F. Hutton & Co., Inc.*, 789 F.2d 105, 111 (2d Cir.1986). Farmland has not preserved this objection for appeal, however, as at trial Farmland made no objection to the definition given, instead objecting to the inclusion of any definition of the term whatsoever. "The basis of a party's objection should not be first learned on appeal or during a party's post-trial motion." *Hughes v. Box*, 814 F.2d 498, 503 (8th Cir.1987).

## IV.

■ Farmland challenges a number of the jury instructions given by the district court. First, it argues that the court gave four instructions stating affirmative defenses to a claim of unauthorized trading, and that this was error because the court had not submitted Farmland's proffered instruction regarding unauthorized trading. As we have held that Farmland's claims for unauthorized trading contained identical elements to the more general fraud instructions, and as Farmland itself saw fit to argue its claim for unauthorized trading before the jury, there was no error in charging the jury with respect to these affirmative defenses.

■ Second, Farmland asserts that the instructions regarding appellants' fiduciary duties erroneously required the jury to find an agency relationship between Farmland and its brokers before imposing such a duty. The trial court concluded that this relationship was necessary under Missouri law, and such determinations of state law are entitled to great deference. *Stoetzel v. Continental Textile Corp. of America*, 768 F.2d 217, 223 (8th Cir.1985). Missouri

---

**6.** For instance, Farmland strenuously argues that Frazier–Parrott violated CFTC rules in destroying order tickets memorializing Farmland's trades, and Farmland contends that the district court erred in not specifically instructing the jury on the applicable CFTC regulation. A complete set of the order tickets was produced from Frazier–Parrott's New York office and was available for Farmland's use at trial, however, and there was repeated reference to the destruc-

tion in the evidence presented by Farmland. On appeal, Farmland presents no arguments suggesting that the document destruction prejudiced it in any way.

**7.** The district court's instruction read "a statement is considered 'material' if a reasonable person would attach importance to it in determining his choice of action."

courts have not considered whether fiduciary duties between a broker and a customer can exist independent of any principal-agent relationship. Those cases that have discussed the subject have in general been consistent with the district court's holding, suggesting that a stockbroker-customer relationship is ordinarily that of principal and agent and that fiduciary duties may arise out of it. *See Mercantile Trust Co., N.A. v. Harper,* 622 S.W.2d 345, 349 (Mo.App. 1981); *Roth v. Roth,* 571 S.W.2d 659, 668 (Mo.App.1978). The district court therefore reasonably concluded that any fiduciary duties owed a customer by a commodities broker arise from an agency relationship.

■ Third, Farmland challenges the propriety of the district court *in pari delicto* instruction,[8] arguing both that this defense is barred by the holding of *Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985), and that no evidence adduced at trial supported such a defense. We are convinced, however, that Farmland misreads *Bateman Eichler,* which ruled the doctrine inapplicable only in the limited factual and procedural context of that case. *Bateman Eichler* was a Rule 10b–5 case in which a "tippee" sued a "tipper" for providing false purported "inside information." The case arose on the tipper's motion to dismiss the complaint, in which motion the tipper asserted *in pari delicto* as a bar to the action. As a result, the Court did not have the benefit of a trial but could decide only on the pleadings before it. Under these narrow circumstances, the Court found that "there is certainly no basis for concluding at this stage of the litigation that the respondents were *in pari delicto* with [petitioners]." *Id.* at 314, 105 S.Ct. at 2631.

Farmland's action, by contrast, proceeded to trial on the merits before a jury. Substantial evidence supported a finding that Farmland, acting through its employee and agent Ernest Pierce, was a knowing participant in the allegedly wrongful activities and bore at least equal responsibility for the injuries it claims. Commodities accounts were opened at Frazier–Parrott through Pierce after Frazier–Parrott was presented with an express corporate "delegation of authority" from Farmland. Pierce directed trading in these accounts, and Farmland eventually made margin payments owing on them. In short, substantial evidence suggested that Farmland was intimately familiar with the trading activity that it now claims was wrongful. The district court's instruction was appropriate.

■ Fourth, Farmland takes issue with the district court's instruction on common law fraud, arguing that the instruction should have set forth each of the alleged misrepresentations made by defendants and that the court erred in requiring the jury to find that Farmland justifiably relied on these alleged misrepresentations. Again, Farmland failed to object on either ground before the district court, and the instruction on common law fraud which Farmland proffered was confusing and did not itself list any of the specific alleged misrepresentations. Indeed, in the instruction conference counsel for Farmland insisted that it would be impractical to enumerate these many alleged misrepresentations. There are no grounds for reversal here.

## V.

This case presents ambiguous conduct that is the subject of widely conflicting testimony against a background of substantial sums of money, which in turn can create motivations ranging from fear to avarice. These are issues that were for the jury to determine in this case. The matters before us are far more simple, whether there was error in framing Farmland's claims for consideration by the jury or sufficient evidence to submit the case against

---

8. The district court's instruction read:
    If you find that Farmland, through its agents and employees, was equally at fault with defendants in causing the losses claimed by Farmland in this case, and acted knowingly in the wrongful activity, and the barring of recovery would not interfere with effective enforcement of the law, you may find that defendants are not liable to Farmland.

Heinold and DEKALB. We have carefully considered the arguments of Farmland and find none of them to be compelling. We affirm the judgment of the district court.