The POLICE RETIREMENT SYSTEM OF ST. LOUIS, a Missouri Statutory Pension Trust, Appellee,

v.

MIDWEST INVESTMENT ADVISORY SERVICE, INC.; James F. Bridges; The Guaranty Trust Co. of Missouri; Angelo J. Parato; James A. Finch, III; I.M. Simon & Co., Inc.; Thomas D. Pixley; E.F. Hutton & Co., Inc.; Paine, Webber, Jackson & Curtis; Diversified Consultants, Inc.;

Donald C. Anton, Appellant,

Dotto Enterprises, Inc.; Aurora L. Anton; Walter P. Klein; Anthony D. Daniele; Vining–Sparks Securities, Inc.; U.S.A. Continental Investors Group, Inc.

The POLICE RETIREMENT SYSTEM OF ST. LOUIS, a Missouri Statutory Pension Trust, Appellant,

v.

MIDWEST INVESTMENT ADVISORY SERVICE, INC.; James F. Bridges; Appellees,

The Guaranty Trust Co. of Missouri; Angelo J. Parato; James A. Finch, III;

I.M. Simon & Co., Inc.; Appellee,

Thomas D. Pixley;

E.F. Hutton & Co., Inc.; Paine, Webber, Jackson & Curtis; Diversified Consultants, Inc.; Donald C. Anton; Appellees,

Dotto Enterprises, Inc.; Aurora L. Anton;

Walter P. Klein, Appellee,

Anthony D. Daniele; Vining–Sparks Securities, Inc.; U.S.A. Continental Investors Group, Inc.

The POLICE RETIREMENT SYSTEM OF ST. LOUIS, a Missouri Statutory Pension Trust, Appellant,

v.

MIDWEST INVESTMENT ADVISORY SERVICE, INC.; James F. Bridges; Appellees,

The Guaranty Trust Co. of Missouri; Angelo J. Parato; James A. Finch, III; I.M. Simon & Co., Inc.; Thomas D. Pixley;

E.F. Hutton & Co., Inc.; Paine, Webber, Jackson & Curtis; Appellees,

Diversified Consultants, Inc.; Donald C. Anton; Dotto Enterprises, Inc.; Aurora L. Anton; Walter P. Klein; Anthony D. Daniele; Vining–Sparks Securities, Inc.; U.S.A. Continental Investors Group, Inc.

Nos. 89–2770EM, 89–3028EM and 90–1743EM.

United States Court of Appeals, Eighth Circuit.

Submitted April 8, 1991.

Filed Aug. 1, 1991.

Rehearing and Rehearing En Banc Denied Sept. 17, 1991.

Andrew F. Puzder, St. Louis, Mo., argued, for appellant; Charles Alan Seigel and Doreen D. Dodson, on brief.

Donald C. Anton, pro se.

Alan E. Popkin, and Byron E. Francis, St. Louis, Mo., argued, for appellee; Michael H. Wetmore, Alan N. Zvibleman, Steven P. Sanders, Jordan B. Cherrick, Andrew B. Mayfield, Michael D. O'Keefe, Gerard K. Sandweg, Jr. and Kenton E. Knickmeyer, on briefs.

Before ARNOLD and FAGG, Circuit Judges, and RE,* Chief Judge.

ARNOLD, Circuit Judge.

This consolidated appeal is about the Police Retirement System of St. Louis and the companies chosen to manage that pension fund's assets. The System grew increasingly dissatisfied with some of its investment advisors. Eventually it fired them, and then sued. The complaint alleged a multi-level scheme to defraud the System. An intervening prosecution of some of the named defendants for crimes arising out of their role in managing the System's investments set the stage for the civil trial on

---

* The Hon. Edward D. Re, Chief Judge, United States Court of International Trade, sitting by designation. Chief Judge Re retired from office under the provisions of 28 U.S.C. § 371(a) on April 30, 1991. He participated in oral argument and in conference and voted to affirm the judgments. Thereafter, he took no part in the consideration or decision of these cases.

review here. A mid-trial settlement between the System and several defendants further narrowed the proceedings. After over two months of proof, the jury (with three exceptions) returned verdicts for the remaining defendants. Almost every party appeals some aspect of the proceedings below. We affirm the judgment of the District Court.[1]

## I.

The Police Retirement System of St. Louis is a creature of Missouri law, Mo. Rev.Stat. §§ 86.200–86.366 (1971 & Supp. 1991). By 1982 it had amassed approximately $150,000,000 from the contributions of St. Louis police officers and the City of St. Louis. The System, through its Board of Trustees, decided to change the way it managed its investments: in addition to retaining the services of one J.A. Glynn, who had advised the fund for nearly forty years, two new investment advisors, Midwest Investment Advisory Services, Inc., and Guaranty Trust Company of Missouri, were selected. The System divided its assets into three portions, one for each advisor. Each new advisor, in turn, dealt with several brokers as it managed its share of the System's investments. Midwest mainly used three brokers: I.M. Simon & Co., Inc., E.F. Hutton & Company, Inc., and Paine-Webber, Inc. (then known as Paine, Webber, Jackson & Curtis, Inc.). Guaranty mainly used two brokers: Vining–Sparks Securities, Inc., and U.S.A. Continental, Inc. J.A. Glynn handled all of his transactions for the System through his own brokers.

In their complaint and at trial the System alleged the following scheme. Midwest and Guaranty were chosen by the System's Board of Trustees at the urging of Walter Klein, a policeman and the Board's chairman, and Donald Anton, a prominent St. Louis lawyer. The price of Klein's and Anton's support was personal profit. Midwest and Guaranty then supposedly selected brokers for the System's transactions based on the benefits to themselves, and to Anton and Klein, rather than on the System's interests. From E.F. Hutton and PaineWebber, Midwest received what are called "soft dollar" benefits—research information about various financial markets. Sending the System's transactions to those brokers, at excessive commission rates, is allegedly how Midwest paid for those benefits. The relationship between Midwest and the broker I.M. Simon was slightly different. Simon also allegedly charged the System excess commissions. A large part of those commissions was then, the System claimed, funnelled back to Midwest and chairman Klein, through two consulting firms owned and controlled by Anton, Dotto Industries, Inc., and Diversified Consultants, Inc., also known as Dicon. Anthony Daniele, a trustee elected after the selection of Midwest and Guaranty, also supposedly benefited from these kickbacks in return for his support of the scheme. In addition, Midwest allegedly increased its investment management fees by "churning" its part of the System's portfolio, that is, by ordering excessive transactions. The particulars of how Guaranty supposedly worked with its brokers to defraud the System are not, in light of its settlement during trial, material to these appeals.

Midwest told a different story. It denied any untoward relationship with Anton, Klein, and Daniele. And it defended its relationships with the various brokers, arguing that their commission rates had not been excessive, and that the market information gleaned from the various soft-dollar agreements was indispensable in advising the System. Further, Midwest claimed to have notified the System's Board of Trustees of these arrangements, and denied churning the System's account. Anton, Klein, and Daniele attempted a defense too. Their efforts were hampered, however, by their prior convictions, which were admitted into evidence, for conspiring to defraud the System.

---

1. The Hon. Stephen N. Limbaugh, United States District Judge for the Eastern and Western Districts of Missouri.

The jury sorted out the evidence and explanations this way. It considered six counts of the System's twenty-one-count amended complaint.[2] On count fourteen, alleging a breach of fiduciary duty by Daniele, the former trustee, the jury found that there was no breach. (The System does not appeal this part of the judgment.) The jury's verdict was mixed on count sixteen, which alleged breaches of fiduciary duty by Midwest and I.M. Simon, and a conspiracy to violate those duties involving, in addition to I.M. Simon, James F. Bridges (Midwest's president), Klein, Anton, and Dicon. The jury found that Midwest had not violated its fiduciary duty. It also found, however, that I.M. Simon had violated its duty to the System. In addition, it found that I.M. Simon, Anton, Dicon, and Klein had conspired in furtherance of a breach of duty by Midwest. Counts seventeen and eighteen alleged further breaches of fiduciary duty, and conspiracies to that end, involving the two brokers, E.F. Hutton and PaineWebber. The jury found for all the defendants in each of these counts. The remaining two counts, twenty and twenty-one, alleged breaches of Midwest's contract with the System, and conspiracies to accomplish those breaches involving Midwest, Bridges, I.M. Simon, Anton, Dicon, Klein, and E.F. Hutton. The jury again absolved Midwest and Bridges, and E.F. Hutton, of any liability. On count twenty, however, it found that I.M. Simon, Anton, Dicon, and Klein had indeed conspired to help Midwest break its contract with the System. (This verdict, Anton argues, is inconsistent with the jury's finding that Midwest did not break its contract. We shall discuss this argument later.)

These appeals followed the entry of judgment and various post-trial motions. No. 89–3028EM is the main appeal. In that case the System alleges that various trial errors led the jury to a confused and mistaken verdict. Midwest and Bridges were found to have done nothing wrong, while the evidence of their liability was allegedly overwhelming, and while some of their associates were found liable. And the amount of damages awarded against those found to have harmed the System, approximately $120,000, was nowhere near the approximately $11 million it alleged and says it proved. No. 89–2770EM is a cross-appeal. In that case Anton presses a variety of alleged trial errors, most prominently the preclusive effect the District Court gave to the facts he admitted in his guilty plea. No. 90–1743EM is the System's appeal of the District Court's decision to award costs to various defendants.

## II.

◼ The first set of questions on appeal clusters around the prior criminal prosecutions of some of the defendants in these cases. Several defendants either admitted, or were found guilty of, crimes. Donald Anton pleaded guilty to conspiracy to set in motion a scheme to defraud the System. He admitted using his influence with the System's investment advisors to steer transactions to I.M. Simon, and sharing in the excess commissions I.M. Simon charged. Joint Appendix Vol. 5, pp. 1800–1830. Walter Klein pleaded guilty to the same crime. Anthony Daniele decided to take his case to a jury. He was convicted of mail fraud, extortion, and conspiracy; his conviction has been affirmed by this Court, *United States v. Daniele*, 886 F.2d 1046 (8th Cir.1989).[3] Several other defen-

---

2. The other fifteen counts fell by the wayside for various reasons. The District Court dismissed three RICO counts before trial. 706 F.Supp. 708 (E.D.Mo.1989). After the settlement with Guaranty, and the other defendants relating to that line of alleged fraud, five more counts dropped out. In addition, the System withdrew three counts of securities fraud, one count of churning, and three state-law fraud counts before the jury took the case. Judgment for the relevant defendants was entered accordingly. Nos. 87–1076C(5), 86–584C(5), Judgment (E.D.Mo. Aug. 2, 1989).

3. After the favorable civil verdict in this case, Daniele moved for a new criminal trial on the basis of newly discovered evidence. He also asked for a reduction in sentence. The District Court denied Daniele's new trial motion, but reduced his sentence by a year. We affirmed, with one exception: we held that Anton's restitution had satisfied his and Daniele's joint and several obligation to the System. Accordingly, we remanded for the District Court to amend the judgment by extinguishing Daniele's restitu-

dants were, for various reasons, neither indicted nor prosecuted. Thomas Pixley, the president of I.M. Simon, cooperated with the government in exchange for a promise that he would not be prosecuted. James Bridges, the president of Midwest, also cooperated with the investigation, and he was not indicted or prosecuted.

Whether Bridges made a deal for his help was hotly disputed. The System contends in the main appeal, No. 89–3028EM, that the District Court erred in admitting testimony and written evidence that neither Bridges nor Midwest was indicted, prosecuted, or granted immunity in return for cooperating with the investigation. The trial court, according to the System, allowed Midwest and Bridges to emphasize early and often that they, as opposed to some of the other defendants, had worked with rather than against the government, and that they were volunteers rather than deal makers. The most damaging evidence came from two witnesses, Terry Adelman, Assistant U.S. Attorney, and Herbert Northcutt, an FBI agent. Both testified that Bridges cooperated without a promise of immunity. The prejudice to the System allegedly came in thus removing two essential players—Midwest and Bridges—from the team working to defraud the System. The result of this error is supposedly borne out in the jury's contradictory verdict: Midwest and Bridges were absolved of liability, while those all around them in the scheme were found liable.

We are not persuaded that the District Court erred in admitting this evidence. It is generally true, as the System urges and Midwest concedes, that "evidence that criminal charges were not brought is inadmissible in a civil case arising out of the same events as the criminal charges." *Goffstein v. State Farm Fire & Casualty Co.*, 764 F.2d 522, 524 (8th Cir.1985). But in this case the System admitted that Bridges and Midwest were not charged. The dispute, instead, centered on why they were not charged. The System's case was built upon the prior criminal proceedings. In its opening statement the System explained those prosecutions, and who cooperated with the government in them, to the jury. Bridges was included among the cooperators. The various indictments and guilty pleas were the System's first exhibits. When Bridges finally took the stand during the plaintiff's case, the System questioned him about his "deal" with the government. In closing argument the System again noted that it believed Bridges had not been prosecuted in return for his cooperation. In sum, Bridges's alleged deal was at the core of the System's theory of this case. We see no error in allowing Midwest and Bridges to use as a shield what the System used as a sword. Moreover, the instruction relating to this issue given by the Court probably helped the jury rather than, as the System contends, confusing matters. Turning the jury's attention away from the fact of nonprosecution to the question of why there was no prosecution, the instruction refocused the deliberations on the relevant disputed facts: Bridges's culpability, and the existence of a "deal" with the government. Nor do we discern a good reason to overcome the heavy presumption in favor of the jury's resolution of this case. See *Zoll v. Eastern Allamakee Community School District*, 588 F.2d 246, 250 (8th Cir.1978). The evidence of Midwest's and Bridges's actions pointed both towards and away from liability. That contradiction, resolvable by reasonable minds in different ways, saves the jury's verdicts for Midwest and Bridges.

■ Anton, in his cross appeal, No. 89–2770EM, also argues that the related criminal investigations and prosecutions contaminated the trial. The District Court accorded preclusive effect to the facts Anton admitted when pleading guilty to conspiracy. The Court also struck Anton's answer to the System's complaint. He was not allowed to call witnesses, either as to liability or damages. In addition, the deposition and grand-jury testimony of Thomas Pixley, the president of I.M. Simon, taken during the course of the criminal investigation, was admitted into evidence. Anton argues

tion obligation. *United States v. Daniele*, 931 F.2d 486 (8th Cir.1991).

that all of these decisions were erroneous and combined to deprive him of a fair trial.

We decline to address on the merits Anton's contentions. His cross-appeal is moot. After pleading guilty, Anton was sentenced to prison and ordered to make restitution to the System. He and Daniele were made jointly and severally liable for a $200,000 restitution obligation. Anton did not appeal any part of his sentence. Joint Appendix Vol. 5, pp. 1829–30. And Anton paid approximately $107,000 to the System. Appellee's Motion to Dismiss Appeal as Moot, Exhibit D. As the District Court noted in a post-trial order, Anton should receive credit toward satisfying his part of the civil judgment in this case for the restitution he has made. Joint Appendix Vol. 5, pp. 1486–87. Anton's restitution, plus other sums paid by persons jointly and severally liable with him, more than satisfies the civil judgment against him. Even if we were to accept all of Anton's arguments, and reverse that judgment as to him, he would receive no benefit: Anton cannot retrieve his restitution. Moreover, since we affirm the judgment with respect to the other defendants, there is no chance that the System could later succeed in imposing a greater obligation on Anton. Because a decision by this Court on Anton's many assignments of error would not have any real effect, case No. 89–2770EM will be dismissed as moot.[4]

### III.

The next group of alleged errors involves § 28(e) of the Securities Exchange Act of 1934. That provision, codified at 15 U.S.C. § 78bb(e)(1) (Supp.1991), provides in part:

No person using the mails, or any means or instrumentality of interstate commerce, in the exercise of investment discretion with respect to an account shall be deemed to have acted unlawfully or to have breached a fiduciary duty under State or Federal law unless expressly provided to the contrary by a law enact-

ed by the Congress or any State subsequent to June 4, 1975, solely by reason of his having caused the account to pay a member of an exchange, broker, or dealer an amount of commission for effecting a securities transaction in excess of the amount of commission another member of an exchange, broker, or dealer would have charged for effecting that transaction, if such person determined in good faith that such amount of commission was reasonable in relation to the value of the brokerage and research services provided by such member, broker, or dealer, viewed in terms of either that particular transaction or his overall responsibilities with respect to the accounts as to which he exercises investment discretion.

This statute was a focal point at trial. Midwest, along with E.F. Hutton and PaineWebber, sought to explain and justify their soft-dollar agreements through § 28(e). The System argued that the commission rates charged by the brokers, and accepted by Midwest, were excessive. Midwest and the brokers countered with the usefulness of the market research and information provided to Midwest for the System. They contended, in the statute's words, that the commissions were "reasonable in relation to the value of the brokerage and research services provided ..." by E.F. Hutton and PaineWebber. Rather than a breach of fiduciary duty, they concluded, the soft-dollar agreements in question exemplified Midwest's good faith efforts on the System's behalf.

■ The System first claims the Court's instruction to the jury about § 28(e) failed to state clearly how narrow the shelter provided by that provision is. We are not prepared to hold that the instruction was erroneous. It is doubtful that the omissions complained about—the word "solely" and an additional paragraph spelling out the behavior § 28(e) does not protect—led the jury astray. The instruction could have been more complete, but, in context, it was not prejudicially incorrect. We do not

---

4. The main appeal is not moot, however. The System claims the jury verdict should have been larger. If it should prevail, it might recover, on a new trial, a judgment larger than the total of

all the sums it has received as restitution or settlement payments. Those payments, therefore, do not make the System's appeal moot.

think the jury understood it to do any more than describe § 28(e)'s effect of protecting brokers against claims of over-charging.

More troubling is the System's allegation that one of the defendants' experts, Lee Pickard, a former head of the Securities and Exchange Commission's Division of Market Regulations and a lawyer, was allowed to explain the reach and meaning of § 28(e) to the jury. This was error. Explaining the law is the judge's job. Pickard's extensive law-related expert testimony allowed him to usurp the judge's place. And from that vantage, the System urges, Pickard improperly swayed the jury's decision on the § 28(e) question.

We agree with the System's contention: Pickard's expert testimony went too far. Pickard's expert-witness credentials were impeccable. He had extensive service in the federal government as a regulator of the financial industry. He even helped promote the idea that Congress adopted in § 28(e). He was the ideal witness to explain the history and purpose of that provision. He also had helpful knowledge of how the securities industry responded to § 28(e), its practices and procedures involving soft-dollar arrangements. Pickard's testimony, however, went farther. He lectured the jury on what § 28(e) meant. He gave extended explanations of why the defendants' conduct was completely sheltered by that provision. T. Vol. 27, pp. 67–78 (July 17, 1989). Some commentators have criticized the general rule against allowing experts to testify on the meaning of the law and have noted with approval the erosion of the rule in some courts, see, *e.g.*, Note, 97 Harv.L.Rev. 797 (1984). We cannot agree that the trend is a good one. See also *Farmland Industries v. Frazier–Parrott Commodities, Inc.*, 871 F.2d 1402, 1409 (8th Cir.1989).

Having agreed with the System's contention, however, we do not agree with its conclusion. For several reasons we cannot say the jury was improperly swayed by the error. The System also offered, and the Court admitted, evidence that should have been excluded because it, too, involved a legal explanation of § 28(e). Both the System's experts testified, albeit not nearly so extensively as Pickard, about the applicability of that provision in this case. More importantly, the System introduced three Securities and Exchange Commission documents that interpreted and explained § 28(e). The System claims that the District Court did not allow it to make full use of these documents, and that therefore they can't help cure Pickard's testimony. We are not persuaded. The documents were in evidence. In our adversarial system, two evidentiary wrongs sometimes make a right. It would have been better for the District Court to have excluded all the offered evidence that explained, in a legal sense, § 28(e). Since it did not, however, we must place Pickard's testimony in the context of all the other evidence admitted about the meaning of § 28(e). So situated, we find no reversible error. This trial lasted for over two months. It would take a lot to persuade us to reverse on the basis of one evidentiary error. No fundamental unfairness occurred.

## IV.

The System also argues it deserves a trial on the racketeering (RICO) counts of its complaint. There were three of those counts: one included all the defendants (except PaineWebber, Daniele, and Vining–Sparks), another included only those defendants that the System alleged defrauded it through dealings with the Guaranty Trust Company, and the final RICO count included only those defendants that the System alleged defrauded it through dealings with Midwest. The District Court dismissed all three counts in a pre-trial order. 706 F.Supp. 708 (E.D.Mo.1989).

The Court was, at that time, on firm ground in its decision. We had taken a narrow view of what would be a "pattern of racketeering activity" sufficient to satisfy the statutory requirement. 18 U.S.C. § 1962 (1984 & Supp.1991). The short of it was this: we refused to recognize a pattern of activity if all the alleged illegal acts were part of a single scheme. See, *e.g.*, *Superior Oil Co. v. Fulmer*, 785 F.2d 252 (8th Cir.1986). It was our multiple-scheme

requirement that snagged the System's RICO counts in the District Court. "The most that can be inferred from plaintiff's pleadings is that the Retirement System's investment advisors, Midwest and Guaranty, each attempted to defraud the Retirement System." 706 F.Supp. at 712. Without multiple schemes there was no pattern of racketeering activity; without a pattern, the System had failed to state a claim under the RICO Act.

The Supreme Court has since corrected our thinking about the RICO Act's pattern requirement. In *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), the Court reversed a decision of this Court applying the multi-scheme understanding of a pattern. The Court held that related acts of racketeering that extend over time or imply a threat that they will be repeated can form a pattern of continued criminal activity. *Id.* 109 S.Ct. at 2900. It expressly disapproved our multi-scheme interpretation of the pattern requirement. *Id.* at 2901.

*H.J. Inc.* was handed down on June 26, 1989, about three weeks into the trial in this case. After the parties had secured a copy of the opinion, the System asked the Court to reinstate its RICO counts. It noted that the evidence on those counts would be identical to the evidence it was introducing on its other claims against the various defendants. The Court said it was not inclined to inject the RICO issue in the middle of the trial. It did not, however, rule on the motion. Asking instead for responses from any party who wished to be heard, the Court promised to decide the motion at the end of that week's testimony. T.Vol. 21, pp. 213–14 (June 28, 1989). The Court never ruled on the motion. And no one raised the reinstatement issue again, until, that is, this appeal.

■ Contrary to the defendants' response, the System did not waive its reinstatement motion by failing to hound the District Court for a ruling. This trial was, to understate the point, complicated and extended. It is understandable that the motion got overlooked. But the System made no mistake here. Nor does anyone contend that *H.J. Inc.*'s pattern standard is not met by the allegations of the System's complaint. There are, however, two additional facts material to our review. During trial the System settled with a large number of the defendants, the Guaranty defendants. That settlement agreement prevents reinstatement of the RICO count directed to those defendants. In addition, that agreement reduces count one of the System's complaint, the comprehensive RICO count, to a restatement of count two—the count alleging racketeering in the management of the System's investments by those defendants associated with Midwest. In effect, then, the settlement leaves only one RICO count that arguably should be reinstated. The second noteworthy fact for purposes of deciding the reinstatement question is the jury's verdict. We have the benefit of their decision on who is liable and who is not on the facts underlying the System's remaining RICO claim. We believe the jury's verdict eliminates the need to reinstate and try that part of the System's amended complaint. That verdict conclusively determines that Midwest was not part of a scheme to defraud. The plaintiff is estopped to relitigate that issue. Without Midwest's involvement, the RICO theory fails completely. The RICO counts allege Midwest's involvement as a key part of the RICO conspiracy. And we have the System's word that reinstatement of the RICO counts would not have caused it to introduce any additional evidence.

## V.

Two other points need to be mentioned. The System challenges the District Court's decision to tax it, in light of the jury's verdict, for E.F. Hutton's, PaineWebber's, and Midwest's costs of defense. Federal Rule of Civil Procedure 54(d) codifies the presumption that, with exceptions not relevant here, costs will be awarded to prevail-

ing parties. The System contends, nonetheless, that the award was premature and unnecessary. We are limited in reviewing this determination to considering whether the Court abused its discretion. *Poe v. John Deere Co.*, 695 F.2d 1103, 1108–09 (8th Cir.1982). The Court referred the various bills of cost to a Magistrate Judge.[5] Changes were made that decreased each defendant's request. Midwest's request, to take the most striking example, was cut almost in half. The District Court's considered decision to award costs based on the Magistrate Judge's recommendation was not an abuse of discretion. Second, Anton asks that we dismiss Diversified Consultants, Inc. (Dicon), from this case. He represents that Dicon surrendered its charter to Missouri before the main appeal was filed, and that the corporation is defunct. No other party objects to this request. It is accordingly granted.

\* \* \*

This complicated trial has made for a complicated appeal. In affirming this judgment in spite of a few rough spots, we place our faith in the good sense of the jury that weighed all these questions over the course of the nine-week trial. The judgment against Dicon is vacated. The appeal in No. 89–2770EM is dismissed as moot, and the cause remanded with directions to vacate the judgment against Anton as moot. In all other respects, we affirm.

It is so ordered.

---

5. The Hon. David D. Noce, United States Magistrate Judge for the Eastern District of Missouri.