**CHARLES DAVIS & ASSOCIATES, INC., Plaintiff,**

v.

**NIKE, INC., Defendant.**

**No. 89–2008–C–5.**

United States District Court, E.D. Missouri, E.D.

Feb. 4, 1991.

Mark T. McCloskey, David Herdon, Lakin & Herndon, St. Louis, Mo., for Charles Davis & Associates, Inc.

Michael Kahn, Todd Aschbacher, Gallop, Johnson & Neuman, Clayton, Mo., Douglas A. Stamm, Beaverton, Or., for Nike, Inc.

## MEMORANDUM

LIMBAUGH, District Judge.

Plaintiff Charles Davis and Associates, Inc. filed a four-count amended complaint against defendant. In Count I plaintiff alleges that defendant tortiously interfered with contractual relations between plaintiff and four of plaintiff's employees. In Count II plaintiff prays for punitive damages for the tort alleged in Count I. In Count III plaintiff alleges that defendant conspired to tortiously interfere with contractual relations between plaintiff and four of plaintiff's employees. In Count IV plaintiff prays for punitive damages for the tort alleged in Count III. This cause is before the Court on defendant's motion for summary judgment.

Courts have repeatedly recognized that summary judgment is a harsh remedy which should be granted only when the moving party has established his right to judgment with such clarity as not to give rise to controversy. *New England Mut. Life Ins. Co. v. Null,* 554 F.2d 896, 901 (8th Cir.1977). Summary judgment motions, however, "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." *Mt. Pleasant v. Associated Electric Cooperative Inc.,* 838 F.2d 268, 273 (8th Cir.1988).

Pursuant to Fed.R.Civ.P. 56(c), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962). The burden is on the moving party. *Mt. Pleasant, supra,* 838 F.2d at 273. Once the moving party discharges this burden, the non-moving party must do more than show that there is some doubt as to the facts. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986).

Instead, the non-moving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

In passing on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that can logically be drawn from those facts. *Buller v. Buechler,* 706 F.2d 844, 846 (8th Cir.1983). The court is required to resolve all conflicts of evidence in favor of the non-moving party. *Robert Johnson Grain Co. v. Chemical Interchange Co.,* 541 F.2d 207, 210 (8th Cir.1976). With these principles in mind, the Court turns to an examination of the facts.

Plaintiff Charles Davis & Associates is an independent sales representative. Charles Davis is the president of plaintiff.[1] The Court refers to Charles Davis & Associates, Inc. and Charles Davis interchangeably as "plaintiff." Defendant NIKE, Inc. is a corporation engaged in the business of designing, manufacturing and selling athletic footwear and apparel. In 1976 defendant selected plaintiff to act as a sales representative of defendant's products. Between 1976 and 1981 plaintiff and defendant entered into several sales representative agreements. In 1981 plaintiff entered into a Sales Representative Agreement with defendant whereby plaintiff was granted the right to market and sell defendant's products in Missouri, Kansas, Nebraska and Southern Illinois. The Sales Representative Agreement was terminable by either party with thirty days notice.

In 1988 plaintiff employed several members of the Davis family and four associate sales representatives ("ASRs"): Robert Logan, Thomas Logan, Rich Bulkley, and Mark Panu. Each ASR executed a con-

---

1. Charles Davis was originally named as a plaintiff in this action. Charles Davis was dropped as a plaintiff when plaintiff filed an amended complaint.

tract with plaintiff that included a restrictive covenant prohibiting the ASRs from competing with plaintiff for a period of eighteen months after the termination of the contract with plaintiff. Each restrictive covenant stated:

For a period of eighteen (18) months from the date of

the termination of this Agreement, for any reason, or the expiration of this Agreement, the employee shall not, within the geographical limits of the State of _____ directly or indirectly, own, manage, operate, join, control, be employed or participate in the ownership, management, operation, or control of, or be connected in any manner with any business of the type and character of business engaged in by the Employer at the time of such termination. In addition to any other rights or remedies available to the Employer for breach of this provision, the Employer shall be entitled to enforcement by court injunction. Any or all provisions of this paragraph may be waived by written consent of Employer. The purpose and intent of this entire provision is to protect Employer from sudden disruption of its principal source of income.

On March 31, 1988 defendant gave plaintiff notice that their contractual relationship would terminate on April 30, 1988. On April 1, 1988 plaintiff telephoned the four ASRs and informed them that his contract with defendant had been terminated.

Plaintiff asserts that on March 31, 1988 plaintiff received a call from Julie Dempster, a management level employee of de-fendant. During this call Ms. Dempster told plaintiff that she had heard of plaintiff's termination from Thomas Logan, one of plaintiff's ASRs.[2]

On April 4, 1988 Robert Logan, an ASR, contacted plaintiff and informed him that the ASRs wanted to meet with plaintiff on April 8, 1988 in Columbia, Missouri. At the April 8, 1988 meeting the ASRs were asked to choose whether they wanted to resign or remain in the employ of plaintiff and attempt to rebuild plaintiff's business with other product lines. The sale of defendant's products had been the primary source of the ASRs' income. The ASRs elected to resign, and indicated they would be amenable to any job offer forthcoming from defendant. At the time of the April 8, 1988 meeting the ASRs had earned a total of $177,000.00 in unpaid commissions.[3]

On April 16, 1988 plaintiff met with defendant to discuss the terms of the termination between plaintiff and defendant. At that meeting plaintiff discussed with Scott Carey, defendant's National Sales Manager, defendant's employment of the ASRs. Plaintiff offered to release the ASRs from the restrictive covenants and allow them to work for defendant if defendant paid plaintiff $1,250,000.00. Defendant rejected plaintiff's offer. On April 16, 1988 plaintiff authorized defendant to talk with the ASRs about employment with defendant but not to extend offers of employment.

After April 16, 1988 defendant contacted the four ASRs and discussed employment opportunities with them. Plaintiff asserts that defendant actually made offers of em-

---

**2.** Plaintiff offers the call from Ms. Dempster as evidence of a conspiracy between defendant and the ASRs to breach the restrictive covenants in the ASRs' contracts. There is a dispute between the parties concerning the date on which the Julie Dempster call occurred. Plaintiff insists that the Dempster call occurred on March 31, 1988, one day before plaintiff informed Thomas Logan of the termination. Defendant, however, asserts that the Dempster call occurred after plaintiff notified the ASRs of the termination. If plaintiff received the Dempster call before plaintiff called Thomas Logan with news of the termination, why did plaintiff routinely call and notify Thomas Logan of the termination as if Logan were ignorant of the fact? If plaintiff had received the Dempster call before plaintiff notified Logan, plaintiff would have immediately questioned Logan as to how Logan learned of the termination either before or simultaneously with plaintiff. There is no suggestion that an inquisition of this sort occurred between plaintiff and Thomas Logan on April 1, 1988.

**3.** There is a dispute concerning whether the resignation of the ASRs resulted in a forfeiture of those commissions. Although the contracts signed by ASRs do not mandate a forfeiture of unpaid commissions upon termination of the contract, some of the ASRs testified in their depositions that they believed their resignation triggered a forfeiture.

ployment to the ASRs. Defendant, however, asserts that its contacts with the ASRs were more tentative. Defendant asserts that it repeatedly warned the ASRs that the possibility of employment with defendant was conditioned upon the ASRs being released from the restrictive covenants in their contracts.

In late April, the ASR's hired an attorney to obtain their release from the restrictive covenants in their contracts with plaintiff. On May 11, 1988 the ASRs obtained a release in a document signed by plaintiff and the four ASRs entitled "Mutual Release." Under the terms of the Mutual Release, the ASRs released all claims to their unpaid commissions from plaintiff.[4] Plaintiff, in turn, released the ASRs "from the operation or enforcement of a restrictive covenant not to compete with the business of [plaintiff]." Pursuant to the Mutual Release, plaintiff agreed that the ASRs could "undertake sales relationships with [defendant] or any other person, firm or corporation, without objection, interference or action of any kind by [defendant]."

After the execution of the mutual release, the ASRs each accepted employment with defendant. All of the ASRs are currently employed by defendant.

### Tortious Interference

In Count I plaintiff alleges that defendant tortiously interfered with the contractual relations between plaintiff and the ASRs. Under Missouri law, plaintiff must establish five elements to sustain a cause of action for tortious interference with contractual relations:

(1) a contract or valid business relationship or expectancy;

(2) knowledge by defendant of the contract or relationship;

(3) intentional interference by defendant which induces breach of contract or relationship;

(4) absence of justification; and

(5) resulting damages.

*Fleming v. Mercantile Bank and Trust Co.*, 766 S.W.2d 666, 668 (Mo.App.1989) (citing *Francisco v. Kansas City Star Company*, 629 S.W.2d 524, 529 (Mo.App.1981)). Plaintiff has satisfied the first two elements. First, plaintiff executed contracts with each of the four ASRs. Each contract included a restrictive covenant that prohibited the ASRs from accepting a position with defendant while the restrictive covenant was in force. Second, defendant was aware that the ASRs executed contracts with plaintiff that contained restrictive covenants. Plaintiff, however, has failed to satisfy the third element.

### Interference Inducing Breach

In order to prosecute an action for tortious interference defendant must have intentionally interfered and induced a breach of the contract. The ASRs would have breached the contracts if they accepted employment and commenced working for defendant when the restrictive covenants were in force. On May 11, 1988 the ASRs secured a release from the restrictive covenants which specifically authorized the ASRs to accept employment with defendant. No breach of their contracts with plaintiff occurred when the ASRs accepted employment with defendant after May 11, 1988. The alleged contacts by defendant did not induce the ASRs to breach the contract. Instead, defendant's contacts induced the ASRs to obtain a release from the restrictive covenants so that they could accept employment with defendant without breaching their contracts.

Plaintiff alleges that the ASRs breached the contract in April, 1988 when defendant contacted the ASRs concerning offers of employment. In order to determine whether the ASRs' contacts with defendant constituted a breach of the con-

---

4. Plaintiff asserts that the ASRs' April 8, 1988 resignation triggered the forfeiture of all unpaid commissions due the ASRs. It seems unlikely that in April, 1988 plaintiff would value the release of the mutual covenants at $1,250,000 and then one month later release the mutual covenants for nothing. It is more plausible that the ASRs possessed a substantial claim for unpaid commissions and this claim served as consideration for the release of the restrictive covenants.

**420**

tracts, the Court must examine the terms of the restrictive covenant. Because restrictive covenants restrain commerce and limit the employee's freedom to pursue his trade, enforcement of such agreements is carefully restricted. *Osage Glass, Inc. v. Donovan,* 693 S.W.2d 71, 73 (Mo. banc 1985).

The restrictive covenants in the ASRs' contracts provide, in relevant part:

> the employee shall not.... directly or indirectly, own, manage, operate, join, control, be employed or participate in the ownership, management, operation, or control of, or be connected in any manner with any business of the type and character of business engaged in by the Employer at the time of such termination.

Although the restrictive covenants prevent the ASRs from engaging in numerous activities with a competitor, including accepting an offer, the terms of the restrictive covenants do not prohibit the ASRs from receiving calls from a competitor regarding possible employment, indicating receptiveness to an offer, or negotiating the terms of the offer. If the Court was to liberally construe the terms of the restrictive covenant, it could find that negotiations aimed toward joining a competitor were a breach of the restrictive covenants. Because the Court must restrictively construe the terms of the restrictive covenant, the Court concludes that the activity engaged in by the ASRs was not expressly prohibited, and no breach occurred.

For the foregoing reasons, the Court enters summary judgment in favor of defendant and against plaintiff on the merits of Count I and Count II, in which plaintiff seeks punitive damages on Count I.

### Conspiracy

■ In Count III plaintiff alleges that defendant conspired with the ASRs and induced them to breach their contractual relationship with plaintiff. As was discussed *supra,* no breach of the contractual relationship between plaintiff and the ASRs occurred. Defendant, therefore, is not liable for tortious interference. Under Missouri law there can be no conspiracy to commit a tort unless the tort itself was committed. *Stegeman v. First Missouri Bank,* 722 S.W.2d 349, 354 (Mo.App.1987). Some wrongful act must have been done by one or more of the alleged conspirators and the fact of a conspiracy merely bears on the liability of the various defendants as tortfeasors. *Farmland Industries v. Frazier–Parrott Commodities, Inc.,* 871 F.2d 1402, 1409 (8th Cir.1989) (*citing Bockover v. Stemmerman,* 708 S.W.2d 179, 182 (Mo. App.1986)). Because defendant committed no tortious act, defendant is not liable for a conspiracy to commit a tortious act.

For the foregoing reasons, the Court enters summary judgment in favor of defendant and against plaintiff on the merits of Count III and Count IV, in which plaintiff seeks punitive damages on Count III.